FILED LODGED
RECEIVED

FEB 28 2019

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                              DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

AJ BREDBERG, d/b/a B&A, INC.;

                              Plaintiff,

v.

ALEX CALLENDER, acting individually
and under color of law in his capacity as a
government employee, and including any
marital community; SEAN CURRAN,
acting individually and under color of law
in his capacity as government employee,
and including any marital community;
HOWARD KNIGHT, acting individually
and under color of law in his capacity as a
government employee, and including any
marital community; RANDY
MIDDAUGH, acting individually and
under color of law in his capacity as a
government employee, and including any
marital community; KIRK PRINDLE,
acting individually and under color of law
in his capacity as a government employee,
and including any marital community;
KATHY VERBLE, acting individually and
under color of law in her capacity as a
government employee, and including any
marital community; JANET MORLAN,
acting individually and under color of law
in her capacity as a government employee,
and including and including any marital
community; KEVIN MOYNIHAN, acting
individually and under color of law in his
capacity as a government employee, and
including any marital community; LOUISE
SOLLIDAY, acting individually and under
color of law in her capacity as a

NO. **CV19 5152 DWC**

VERIFIED COMPLAINT

Jury Demand

COMPLAINT: BREDBERG v. CALLENDER, et. al.
Page 1 of 72

1   government employee, and including any
2   marital community; PAUL ANDERSON,
    acting individually and under color of law
3   in his capacity as a government employee,
    and including any marital community;
4   DOUG GRESHAM, acting individually
    and under color of law in his capacity as a
5   government employee, and including any
    marital community; JOHN COOPER,
6   acting individually and under color of law
    in his capacity as a government employee,
7   and including any marital community;
    ERIK STOCKDALE, acting individually
8   and under color of law in his capacity as a
    government employee; JOSH BALDI,
9   acting individually and under color of law
    in his capacity as a government employee;
10  NELL LUND, acting individually as an
11  employee of The Watershed Company;
    ALEX CAPRON, acting individually in his
12  capacity as an employee of The Watershed
    Company; HUGH MORTENSEN, acting
13  individually and in his capacity as President
    of The Watershed Company; THE
14  WATERSHED COMPANY, a Washington
    for-profit corporation; KATHLEEN KUNZ,
15  acting individually and under color of law
    in her capacity as a government employee;
16  MICHELLE WALKER, acting individually
17  and under color of law in her capacity as a
    government employee; SARAH COOK,
18  acting individually and under color of law
    in her capacity as a government employee;
19  SIRI NELSON, acting individually and
    under color of law in her capacity as a
20  government employee;  MATT
    CADICAMO, acting individually and under
21  color of law in his capacity as a government
    employee; KATHRYN E. HEARD, acting
22  individually and under color of law in his
    capacity as a government employee;
23  DANIEL A. KRENZ, acting individually
24  and under color of law in his capacity as a
25

government employee; JERALD J.
GREGORY, acting individually and under
color of law in his capacity as a government
employee; JAMES GOUDZWAARD,
acting individually and under color of law
in his capacity as a government employee;
SOCIETY OF WETLAND SCIENTISTS
CERTIFICATION PROGRAM, an
international non-profit organization; and
JOHN DOES 1-10,

Defendants.

Plaintiff AJ Bredberg alleges as follows:

## I.   PARTIES

1.      AJ Bredberg resides at 3303 43rd Street, Gig Harbor, Washington 98335. He is the sole

proprietor of a business, "B&A, Inc.," located at the same address. Plaintiff AJ Bredberg is

hereinafter referred to as "Plaintiff."

2.      Each of the Defendants acted and are acting in all events relevant herein as individuals

operating a criminal enterprise, but also served in various positions for government agencies, for

organizations, or for businesses as heretofore specified. Defendants Alex Callender, Sean

Curran, Howard Knight, Randy Middaugh, Kirk Prindle, Paul Anderson, Doug Gresham, John

Cooper, Erik Stockdale, and Josh Baldi are currently or were at relevant times government

employees in the State of Washington. John Does 1-10 may or may not be government

employees in the State of Washington. Plaintiff does not know the true names of all persons

complicit with the conduct described in this Complaint adverse to Plaintiff's interests and/or to

the interests of his business, and to the interests of his clients who have had business before

various government agencies in the States of Washington, New York and Oregon during the

relevant time frame of this Complaint.

3.      Defendants Sean Curran, Howard Knight, Randy Middaugh, and Kirk Prindle are or were

during the relevant time frame employees of Snohomish County, Washington. Defendant John

Cooper is or was during the relevant time frame an employee of Skagit County, Washington.

Defendants Curran, Knight, Middaugh, Cooper, and Prindle reside in the State of Washington.

John Does 1-10 may be employees of counties or cities within the State of Washington.

4.      On information and belief, Defendants Paul Anderson, Doug Gresham, Alex Callender,

Erik Stockdale, and Josh Baldi are or were during the relevant time frame employees of the State

of Washington who resided in and currently reside in the State of Washington. John Does 1-10

may be employees of the State of Washington.

5.      On information and belief, Defendants Kathy Verble, Janet Morlan, Kevin Moynihan,

and Louise Solliday are or were during the relevant time frame employees of the State of

Oregon, who resided in and currently reside in the State of Oregon. John Does 1-10 may be

employees of the State of Oregon.

6.      Defendant The Watershed Company is a for-profit Washington corporation. Defendants

Nell Lund, Alex Capron, and Hugh Mortensen are or were during the relevant time frame

employees of Defendant The Watershed Company, and on information and belief reside in the

State of Washington. John Does 1-10 may be employees of The Watershed Company.

7.      Defendants Kathleen Kunz, Michelle Walker, Sarah Cook, Siri Nelson, Matt Cadicamo,

Kathryn E. Heard, Daniel A. Krenz, and Jerald J. Gregory are or were during the relevant time

frame employees of the U.S. Army Corps of Engineers, and on information and belief each

Defendant resides in the State of Washington. Defendant James Goudzwaard resided in Montana

at the time of his acts, and was during the relevant time frame an employee of the U.S. Army Corps at the Portland, Oregon office.  John Does 1-10 may be employees of the U.S. Army Corps of Engineers or of other federal government agencies.

8.      Defendant the Society of Wetland Scientists Certification Program ["Society"] is an organization which claims to exist for the purpose of promoting science-based management and sustainability of wetlands, and which grants itself the power, either directly or indirectly, either alone or in conjunction with others, to achieve these purposes.  The Society of Wetland Scientists Certification Program is based in Hoffman Estates, Illinois. Defendant Society claims exemption from United States Federal income taxation as corporations described in Section 501(c)(3) of the USA Internal Revenue Code of 1954. John Does 1-10 may be members of Defendant Society.

## II.      JURISDICTION & VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because some of claims in this civil action arise under the Constitution or other laws of the United States, 42 U.S.C. § 1983, Washington State Constitution, and Washington state law. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343.  This court has ancillary or supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in the District Court for the Western District of Washington under 28 U.S.C. § 1391(b) in that several of the Defendants reside in this judicial district and that several of the events or omissions giving rise to this action occurred in this judicial district.

## III.      FACTS

11.     The Plaintiff was a certified professional soil scientist, certified professional soil classifier, and professional wetlands scientist.  The Plaintiff has published scientific articles, conducts research, holds patents, consults nationally and internationally and has over 4,000 wetland delineations approved by Federal, State and Local government agencies. The Plaintiff's sole proprietorship, B&A, Inc., contracts with property owners, cities, tribes, schools, churches, charities, non-profit groups, foreign citizens, and developers to perform wetland delineations. Many of the Plaintiff's clients have business before government agencies in the States of Washington and Oregon, and before federal government agencies. .

12.     As the direct result of actions committed by the Defendants individually under color of law and in conspiracy as herein alleged, the Plaintiff has been defamed both professionally and personally. The Defendants' actions have caused a disruption in the Plaintiff's career and earning capacity, interference with existing and prospective contractual relations, and economic losses. Defendants have repeatedly referred to the Plaintiff in a derogatory manner, both to his clients and to unknown other persons. Defendants have treated the Plaintiff unjustly, unfairly, and differently than other consultants whose clients have business before government agencies in Washington and Oregon, and before federal agencies. Defendants cannot assert a legitimate business interest in harming the Plaintiff's reputation before his clients and prospective clients, and in causing a loss of business and monetary damages to the Plaintiff.

13.     The Enterprise in this action is an amalgam of individuals, organizations and businesses, including the Defendants, the Watershed Company, and Society, a program affiliated with a professional organization whose membership consists of soils scientists and wetlands biologists. Defendant Society itself fails and/or neglects to adhere to and to promote strict adherence to

United States government/federal manuals, which manuals specify the correct and lawful methods for making wetlands determinations.  Defendant Society purports to certify professional wetland scientists who demonstrate that those individuals do, in fact, strictly adhere to those manuals and other protocols.

14.     The Plaintiff asserts that the law or laws at issue in this matter are found in the federal RICO statutes. The Plaintiff has suffered because the Defendants are willing to conspire with one another, and to both individually and collectively inflict harm upon him while operating under color of law. Even should a Defendant or Defendants not realize direct financial gain from their actions, the RICO statutes offer a plaintiff the prospect of consequences for the Defendants' actions, lest individuals in a civil society continue to conduct themselves in this manner to the detriment of not only intended victims, but communities and society as a whole.

15.     The Enterprise in this action may be, and has been, referred to as the "Wetland Mafia" or alternatively and at least as a criminal syndicate. These individuals include both government and non-government actors. These individuals are associated with the same groups and programs. Enterprise Members hold positions of power and influence in both the government and private sectors. Enterprise Members collaborate to support the Enterprise through fraud, perjury, coercion, threats, intimidation and other activities.

### NELL LUND
### THE WATERSHED COMPANY

16.     As an example of Enterprise RICO activity, in 2014 an Engineer, Greg Krabbe, submitted a report which had been prepared by the Plaintiff to the City of Sammamish, Washington [Exhibit 1]. As Mr. Krabbe related in a witness statement [Exhibit 2],

> "In 2014, I recall that a wetland study performed by Mr. Bredberg had been submitted to the City of Sammamish (B&A Job 4683). At the time I spoke with a City employee and responsible officer, Ms. Curry. We discussed the Bredberg report. Ms. Curry informed

me that since the report had been prepared by Mr. Bredberg, the City would take much longer to perform a review than if a different wetland biologist had prepared the report. Because it was a Bredberg report, she indicated that the City would have to employ an outside consultant to review the work and possibly bring in the Washington Department of Ecology (DOE). Ultimately the Washington DOE was invited to make a site visit and verify Mr. Bredberg's work. I was informed by Ms. Curry that Mr. Bredberg would not be allowed on-site to defend his work due to Washington DOE policy that was unique to Mr. Bredberg."

17.     The City of Sammamish had designated Defendant Nell Lund from The Watershed Company to perform a professional third-party review, and Lund was paid by the Plaintiff's client for his services. [Exhibit 3]  Defendant Lund had reported to the City that two wetlands were present on the property at issue. However, soil data had been falsified to show wetland soils, and regardless that the water table did not meet wetland criteria, Defendant Lund declared that the areas were wetlands. [Exhibit 4]

18.     The Washington DOE then made a site visit with Ms. Curry, to which the Plaintiff had been barred. Washington DOE subsequently found that the Plaintiff was correct that  the large wetland Defendant Lund had declared wet was not a wetland, and that the other wetland Defendant Lund had declared was only 150 sq. ft. total in size. This necessitated the Plaintiff making another site visit, to begin preparing a rebuttal to the fraudulent data prepared by Defendant Lund and the Watershed Company, and to the misdirected Washington DOE and City conclusion. [Exhibit 5; Exhibit 6] The Plaintiff needed to rent an excavator, to dig deep holes, and thus to prove what should have been obvious from the Plaintiff's report. [Exhibit 7] The Plaintiff had identified drain tiles in the original report, and a 150 sq. ft. wetland could not exist above a subsurface drain tile.

19.     Yet the Plaintiff was forced to spend substantial additional time and expense preparing a document to both refute the fraudulent data and misdirected conclusion, and in pointing out the obvious with reference to the drain tiles. [Exhibit 8]  Mr. Krabbe, armed with the document the

Plaintiff had prepared, was able to convince the City that the purported wetland could not exist. The City concurred with the Plaintiff's conclusion, and approved 100% of the Plaintiff's original report.

20.     All of the extra time and expense could have been prevented and avoided had the Plaintiff been allowed to attend the site visit at which Defendant Lund and the City representative had attended, or any of the other site visits at which data was collected on the site. The Plaintiff would have pointed out the drain tiles in his report, which should have been obvious to Defendant Lund and to the City, would have provided a primer on the impossibility of a wetland existing atop drain tile, would have conferred with Defendant Lund and the City officers, and the developer/landowner's project would have been able to proceed months earlier.

21.     Because so much extra time and expense was involved, the Plaintiff invoiced his client for only ¼ of the time he had spent. The actions of Defendant Lund and The Watershed Company had required additional site visits, phone calls, emails, research, and additional detailed reports. Yet the Plaintiff had presented, in writing, the simplest industry knowledge and best science in his original report.

22.     Because Defendant Lund, the Watershed Company, and others had purposefully and intentionally ignored the Plaintiff's report and findings except to challenge and deny them, the developer's project was delayed, and his costs were increased.  But the developer was left to assume that the cause of his delays and that the reason for his added expenses was that he had contracted with the Plaintiff.

23.     Members of the Enterprise, and with collusion by the Society, make determinations of large wetlands where there are either no wetlands or small wetlands, resulting in the need for expensive mitigation plans, resulting in monetary gain by the Society, by its' members, and by

government agencies, resulting in increased need for government agency staff and budgets,
resulting in litigation, resulting in the need to pay legal counsel, and finally, resulting in
monetary and property losses incurred by property owners, by state and federal highway
projects, by drainage districts, by schools, cities, and other public agencies, by foreign citizens,
by potential developers, and by the Plaintiff.

24.     Members of the Enterprise, and with collusion by The Society and its members,
specifically including some or all of the Defendants, gather field data, refuse access to that data
until after it is manipulated and falsified, and then issue a report relying upon that data, to the
detriment of the Plaintiff and his clients, and to the interests of civil justice.

25.     For example, Exhibit 9 is attached to this pleading. Exhibit 9 concerns a project in Lake
Stevens, Washington. [Exhibit 9]  Defendant Lund reviewed a report submitted by Plaintiff on
the subject property/project. Lund failed and/or refused to perform due diligence. Lund did not
walk the property, and as a result, Lund rated the wrong wetland. In the Plaintiff's report
[Exhibit 10] dated March 1, 2017,  the Plaintiff had stated that there was a long, narrow wetland
on the property which follows a stream, and that thus the proper rating was "riverine." The
Plaintiff had also noted a larger, depressional wetland downstream, but not adjacent to the site
[Exhibit 11].

26.     Defendant Lund, however, used the latter wetland as the basis for The Watershed
Company's review, with the direct result that the buffer was increased, and that the Plaintiff's
client was denied an extra lot on his property, in addition to necessitating the performance of
extra survey work at substantial added expense, and unnecessary, costly delay. As further result,
the Plaintiff lost his entire second billing [Exhibit 12], in addition to a loss of all future projects

with the surveyors/engineers, due to damage to his professional reputation, and lost credibility with the City of Lake Stevens.

27.     Thus, the pattern at play is the falsification of review data and disparagement of the Plaintiff's professional work product. The wetland industry revolves around and begins with the delineation. If the delineation finds that a wetland exists, further work is performed. If the delineation finds that no wetland is present, the issue is settled. Codified government manuals provide a scientific and reproducible cookbook approach as to determining whether a wetland is present. Data sheets are prepared during and pursuant to the delineation, and those data sheets provide the support for the determination as to whether a wetland is present, and if so, the size and location and category of that wetland is determined by survey and other manuals. The information notated in those data sheets is gathered in the field and a wetland determination is made in the field when the data is gathered. The completed report is submitted for review by the Federal, State or local government agency with jurisdiction.

28.     Once the report is submitted, the jurisdictional authorities typically arrange for a 3rd party review. The normal procedure is for the 3rd party reviewer and the preparer of the report to meet on-site, to view the property, and to review and professionally discuss the data plots and data sheets to confirm accuracy. The experience, credentials and expertise of the individuals participating in this interaction may vary. The Plaintiff in this action has been recognized as a professional with demonstrated expertise to exceed many and arguably most other professionals in the wetland industry. The record reflects the Plaintiff's quantifiable experience.

29.     On a typical field visit and interaction with other professionals, the Plaintiff presents the scientific basis for his position. That position will be upheld and thus the Plaintiff's conclusions will be accepted, unless the other professional notes any errors, and those errors are discussed. At

times and in cases, the Plaintiff has found that the other professional had correctly noted errors, in which cases the Plaintiff would make the necessary corrections, changes, and revisions. This procedure is very efficient. The Plaintiff has had a pleasant professional experience with many of his colleagues and compatriots.

30.     However, a problem is created and an impediment is placed when the other professionals approach a case with a preconceived opinion that a certain area must certainly be a wetland – especially if in fact it is not a wetland. Such professionals in the wetland industry comprise the Enterprise. Both individually and collectively, those professionals choose to ignore the factual manuals and procedures at their disposal, and which they are required to comply with and adhere to, and thus without regard to facts and protocol follow through with their determination to conclude that a property is wet. When in fact that property is not wet, both the Plaintiff and the property owners are hurt.

31.     The Plaintiff's practice in all cases is to utilize the codified government manuals. The Plaintiff has repeatedly proven, in certain cases as referenced specifically herein but on multiple occasions referenced as "at other times," that those properties are not wet. The added expense and delay, and the damage to the Plaintiff's reputation, occur regardless whether the Plaintiff is able to disprove the erroneous assertions of the Defendant members of the Enterprise. Many of those delays and expenses are ongoing as of February, 2019. Many properties declared wetlands by those professionals, which are not in fact wetlands, remain to this day encumbered by those erroneous assertions, and as such are neither sold nor developed.

32.     Importantly, when the Defendants and thus the Enterprise itself consider and discuss the Plaintiff's successes in disproving their assertions, in overturning their decisions, and in proving their negligence and culpability, the Plaintiff has been targeted for undermining, for ridicule, for

disparagement, and for removal as a threat to the Enterprise and its members. While on the fortunate side, good science and properly following the required manuals and protocols often prevails when the Plaintiff has had an opportunity to present his case, on the unfortunate side such opportunities are not always granted or available.

33.    Accordingly, while the Plaintiff has been successful in overturning hundreds of wetland decisions Enterprise members from the U.S. Army Corps of Engineers, from counties, from the Washington DOE, from cities, and from the private sector, the Enterprise has increasingly made this more difficult. Whereas the Plaintiff had been able to meet onsite with those professionals, and to present superior scientific documentation, that changed with the creation and dissemination of memoranda from Enterprise members amongst themselves and to others, which disparaged the Plaintiff and directed that members should neither meet with the Plaintiff on-site, nor discuss site conditions and data with the Plaintiff. Despite that the Federal Manual mandates a decision at each sample plot, the Enterprise determined that by refusing to issue a decision in the field, and by refusing to discuss data and findings and site conditions with the Plaintiff, members could return to their offices and there fabricate data, thus fabricating a decision without witnesses. If the Plaintiff was kept away from the sampling on-site, the members could easily and in fact have falsified data through manipulation and alteration, in order to support a refutation of the Plaintiff's findings.

34.    The successful demonization of the Plaintiff as an individual who would intimidate and threaten members through aggressive behavior, or as an individual who was "capable of future harassment" impeded any hope of a factual, correct, and truthful decision rendered in response to a property owner's request to perform an activity on his own property. But the Plaintiff had asked questions, and the Enterprise deemed questioning the actions and decisions and conduct of

its members an unacceptable display of effrontery, which more crucially threatened exposure of the syndicate's collusive and fraudulent activities.

35.     The Enterprise thus established a pattern of threats and intimidation against the Plaintiff, in pursuit of his silence and complacency. The Enterprise ensured that the Plaintiff's reports would be given extra scrutiny, that decisions on his delineations would be delayed, that he would be banished from the field, that he would fear investigation or even arrest, that he would feel unsettling fear itself generally from constant intimidation, and from knowing that Enterprise members were collecting data in secret, falsifying data away from the site and away from the Plaintiff's view and possible justified oversight, refusing to share field data, and from knowing that his reputation was being harmed by defamatory emails and correspondence and other communications among members, to his clients, to his colleagues, and to potential clients.

36.     The Plaintiff could at times, and did, seek redress and vindication through public Hearings on individual cases. Since such Hearings are typically quasi-judicial, the Plaintiff at times would present on behalf of his clients, and would be provided with opportunities to question Enterprise members under oath. The Plaintiff would typically enter a soil sample monolith – a sample slab of soil taken from an 18-inch hole, representative of the sample plot -- as evidence at Hearing. The Plaintiff's field data and the Enterprise member's field data were then compared to the actual soil taken from the field before the Hearing Examiner. In many documented cases, the Plaintiff's data matched the soil sample, while the Enterprise member's field data was proven to be fraudulent.

37.     The Plaintiff and his client thus prevailed, and yet the Enterprise was able to continue. At times, the Enterprise revised its tactics. For example, Pierce County, Washington increased Hearing filing fees from $500 to $3,000, in order to discourage Hearings. Since many applicants

1   could not afford $3,000 to pay for a Hearing, those Hearings did not occur. Thus, there was a

2   denial of due process.

3   38.     The Enterprise would also intentionally and purposefully delay projects by holding up

4   decisions, while ultimately being forced by the scientific facts to rule that the Plaintiff was

5   correct all along. The Plaintiff still awaits, as of January, 2019, a decision from the U.S. Army

6   Corps of Engineers which has been anticipated for nearly ten (10) years since the site visit

7   occurred, and data was gathered. During the ensuing decade, the Enterprise has asked for more

8   information on basis that the information the Plaintiff had provided was insufficient. To each

9   request, the Plaintiff has provided more information. The Enterprise has continued to re-assert

10  that more information is needed. Yet the Enterprise has produced no data to support their

11  contention that the Plaintiff's submitted data was insufficient, nor that the additional submitted

12  data and information was insufficient.

13  39.     As a result, at many times the Plaintiff's clients were financially coerced into firing the

14  Plaintiff, and to replace the Plaintiff with an Enterprise member "in order to get the project

15  moving." The Plaintiff's clients have been told that their projects would be consistently,

16  repeatedly, and indefinitely held up if the clients contracted with the Plaintiff. Enterprise

17  members, including governmental regulatory personnel with authority under color of law, have

18  informed the Plaintiff's clients that the Plaintiff's work would never be approved.

19  40.     Enterprise members have also filed false complaints, fraudulent data, and have

20  committed other actions in pursuit of the revocation of the Plaintiff's professional certifications.

21  In order to avoid having to appear at Hearing adversarial to the Plaintiff, Enterprise members

22  have refused to allow the Plaintiff's projects to proceed to hearing – utilizing legal personnel and

23  their authority – and have approved Writs of Mandamus, or have settled cases prior to Hearing.

24

25

The Plaintiff has been informed that he is not on a "special list" of approved individuals, and that the Plaintiff must therefore pay a $500 fee before he should be allowed to appear at Hearing.

41.     The Plaintiff has struggled to remain in business as the result of Enterprise activities, with yet the saving graces of those honest 3rd party reviewers, and professionals with authority in honest jurisdictions, with whom he is privileged to interact. The Plaintiff also benefits at times from an underground reputation of sorts, insofar as landowners are able to avail themselves of information that when Enterprise members have devalued their property and impeded or even decimated their projects, the Plaintiff has proven himself able to restore value via the Hearing process and by employing the advantage of proper manuals and protocols.

42.     The Plaintiff has at times been successful at expediting a purposefully delayed process. Yet at other times, both the Plaintiff and the landowner have been stymied and denied, cheated and frustrated, undermined and at least insofar as the Plaintiff and his professional reputation, defamed and disparaged. For example, for a lengthy period of time an Enterprise member in Kitsap County, Washington impeded the Plaintiff's cases and frustrated his landowner clients, following the pattern of conduct herein alleged. Remarkably, when the Enterprise member left the employ of the county, the Plaintiff found that his reports were thereafter repeatedly and consistently approved without the same prejudicial delay. Yet when a new Enterprise member joined county staff, the Plaintiff again lost most of his lucrative business in Kitsap County, as the pattern of conduct resumed.

43.     The Plaintiff recognizes that the jurisdictions and government agencies themselves are not necessarily the problem, but rather that the problem at issue is the Enterprise and its' members. While the Oregon Department of Justice, the Washington Attorney General's office, and many county prosecuting attorneys may well be aware of the unlawful and tortious acts

committed by the Enterprise and its members, and take no actions to rectify the situation, thus in a sense colluding with the Enterprise through negligence, the Plaintiff cannot discern where the responsibilities and culpability of governmental agencies and actors meet, and where precisely they diverge.

44.     The Plaintiff cannot know, without discovery and the intervening authority of a Court with jurisdiction, whether government itself or agencies thereof have caused harm to his professional reputation and to his clients, or whether individual members of the Enterprise, acting as individuals but also conspiratorially as Enterprise members, have caused and perpetuated that harm. Thus the Plaintiff cannot know whether government or the individual Enterprise members are financially liable to the Plaintiff for the acts alleged herein.

45.     The Defendants' conduct includes but is not limited to the following facts: On or about 2014, a business and real estate developer and contractor proposed a development to be located in Snohomish County, Washington. A previous project had been approved on the basis of a wetland study prepared by a consulting company, "Wetland Resources." The Wetland Resources study indicated an extensive wetland north of the subject property. The entire wetland study was reviewed and approved by Snohomish County staff [Exhibit 13]. Because new, larger buffers had been drawn onto an older wetland map, substantial property was lost. The developer contracted with the Plaintiff to perform a wetland delineation of the site and proposed project, and to review the Wetland Resources report. The Plaintiff completed his study, with the result that the Plaintiff's report was approved. Yet the Plaintiff's report had indicated the correct wetlands [Exhibit 14]. The Wetland Resources report had been erroneous, and yet it had been approved by the County. The Plaintiff had exposed errors in the Wetland Resources report, and

1   further exposed the County's substandard and shoddy review. The County had essentially

2   rubber-stamped the Wetland Resources report, while yet the Plaintiff's report received extra

3   scrutiny.

4                                    **KIRK PRINDLE**

5   46.     After the appropriate and necessary applications and filings of supportive documentation

6   had been made, this development was under consideration by Snohomish County. Those

7   documents included the results of a qualified professional review and wetland delineation of the

8   property performed by B&A, Inc. [Exhibit 15] The developer met with Snohomish County

9   planning department personnel and with the County's biologist. Those individuals turned the

10  discussion from the development to the subject of the Plaintiff and his business. [Exhibit 16]

11  The developer was informed that since he wanted his development approved and for construction

12  to commence, it was unfortunate that he had associated with the Plaintiff.  Defendant Kirk

13  Prindle, a Snohomish County employee, on his own initiative and under color of law determined

14  that defamation of the Plaintiff directly to the developer would serve Enterprise purposes, and

15  acting upon that determination, Defendant Prindle proceeded to defame the Plaintiff as such. The

16  Defendant stated that the Plaintiff's reviews and delineations are "always incorrect, and always

17  rejected."

18  47.     On basis of the developer's contractual relationship with the Plaintiff and his business,

19  Snohomish County, via Defendants employed by the county and acting under color of law,

20  intentionally delayed the project.  As part of this delay process, the project was referred to the

21  Washington Department of Ecology. Subsequently, Ecology agreed with the Plaintiff's review

22  and delineation, with but a minor change that did not impact the project [Exhibit 17; Exhibit 18].

Yet in the course of this matter, Ecology had notified the Plaintiff that he was barred from being onsite with a Washington DOE staff member. While the Washington DOE allows other wetland scientists to accompany and to meet with Department staff members onsite, and to discuss the projects and reports at issue, responsible officers for the Department explicitly banned the Plaintiff from enjoying the same advantageous interactions, thus treating him exceptionally and to his professional detriment. The project was delayed on the basis of a preconceived bias by Snohomish County against the Plaintiff. The developer has been punished by Snohomish County for contracting with the Plaintiff. The Defendants are causing the developer and his partners to suffer financial damages due to their retaliation against them for contracting with the Plaintiff.

48.     The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts: On or about 2015, a developer and resident of Snohomish County paid the County to perform a wetland review of his property [Exhibit 19]. The developer spoke with a responsible officer for the County regarding a previous wetland delineation performed by the Plaintiff for the developer. The developer informed the officer that he wanted the Plaintiff onsite when the County performed its' own review. The officer refused that request, and in fact stated that he would not meet with the Plaintiff at any time. The officer informed the developer that since the developer had contracted with the Plaintiff, it would take the County from six weeks to two months before they would be able to visit the site. When the developer proposed having a different consultant visit the site with the County on his behalf, the officer said that the County would be able to visit the site in two days. When this site visit occurred, the other consultant asked the officer to confirm the Plaintiff's

findings.  The officer refused. The allegations herein include that the Defendants discriminated against the Plaintiff, and against any individual with interests before the County whom contracts with the Plaintiff.

49.     The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts: On or about 2014, an engineer and business consultant in Snohomish County related that he spoke with a responsible officer and employee for the County regarding a development project.  When the engineer stated that he had used the Plaintiff's services, the employee responded that the County did not accept work performed by the Plaintiff, and followed that statement with "a series of derogatory remarks" about the Plaintiff. [Exhibit 20]  The Defendants harbor an unwarranted professional bias against the Plaintiff, and act upon this bias not only to the Plaintiff's detriment, but to the detriment of his clients.

50.     The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts: On or about 2015, a property owner and developer in Snohomish County spoke with responsible officers for Snohomish County about a proposed project. When the developer noted that he had contracted with B&A, Inc. to perform a wetland review, an officer and employee disparaged the Plaintiff.  The officer and employee intended to demean the Plaintiff to the developer, in order to dissuade contracting with the Plaintiff.

**ALEX CAPRON**
**NELL LUND**
**THE WATERSHED COMPANY**
**HUGH MORTENSON**

51.     The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts:  On or about 2018, Defendant Alex Capron, an employee of the Watershed Company, a Seattle-area environmental consulting firm, acting purportedly on behalf of his employer but with individual initiative as motivated by his employer and with malicious intent, made defamatory statements about the Plaintiff and about his professional work to third parties, with the direct result of lost clients and revenues.  [Exhibit 21]

52.     The Plaintiff alleges that among the agencies provided with falsified data and to whom the alleged defamatory statements were made were the City of Lake Stevens in the County of Snohomish, both in the State of Washington.

53.     On or about 2018, Defendant Nell Lund, acting purportedly on behalf of her employer, Defendant The Watershed Company, but with individual initiative as encouraged by her employer and with malicious intent, defrauded the Plaintiff by falsifying data on a project in Lake Stevens, Washington, with the direct result of lost clients and revenues. For example, defendant Lund falsified field data on a development project, and declared a created wetland which was not in fact neither a natural wetland nor a regulated wetland, with the result that the Plaintiff's client lost ten building lots valued at $100,000 each. Further, the Plaintiff lost $20,000 in fees, and a substantial loss of credibility with the government agency involved, with his client, with an engineer, with a surveyor, and with prospective clients.  [Exhibit 22; Exhibit 23; Exhibit 24; Exhibit 25]

**PAUL ANDERSON**
**JOHN COOPER**

54.     The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts:  On or about 2014 and continuing until at least 2017, Defendant Paul Anderson, formerly an employee with the Washington DOE, to the Plaintiff's knowledge and belief retired and/or self-employed as of the initial filing of this complaint, repeatedly and with malicious intent falsified data and disparaged the Plaintiff to his clients and other soils professionals.

55.     As an example, the Plaintiff had a client in Burlington, Washington, with a gravel pit for sale.  The sale was set to close for approximately $1.8 million [Exhibit 26].  The Plaintiff's client had cleared a former farm field of trees five months prior to the scheduled sale closing, and for the act of clearing had been reported to the Washington DOE for a wetland violation.  Three to four months prior to the scheduled sale closing, Anderson, presumably assigned to the matter by his employer, although the Plaintiff cannot know without discovery whether Anderson possessed authority to choose his work assignments, decided to review the gravel pit, and thereafter authored a report which stated that the majority of the cleared area was a wetland.[Exhibit 27] The Plaintiff performed a scientific analysis/study of the same area, and found no wetland. [Exhibit 28]

56.     Two months prior to the scheduled sale, Randal Perry, an employee with the U.S. Army Corps of Engineers, reviewed both the Plaintiff's report and Anderson's report due to their differences, and performed a site visit. [Exhibit 29]  Perry stated at the end of the site visit that he neither saw nor detected any wetlands in the cleared area, thus concurring with the Plaintiff's report.  However, the Army Corps of Engineers refused to issue an opinion to that effect. As a direct result, the sale of the property fell through.

57.     Four months after the scheduled sale would have occurred, Tom Sheehan, a decorated Vietnam War veteran and a friend of the Plaintiff's client and his spouse – owners of the gravel pit – visited and spoke with the Army Corps officer with responsibility for the matter at issue. When the responsible officer, a Colonel, had been made aware by Sheehan that Army Corps staff had stonewalled on issuing a decision which would have conflicted with the report written by Anderson, the Colonel ordered staff to issue a decision. [Exhibit 30]

58.     One month after the visit by Sheehan, a team of US Army Corps personnel met at the property with the Plaintiff, his associates, with Anderson, and with counsel for the potential property buyer.  The Army Corps team reviewed the reports, performed tests on the property, and subsequently issued a report which stated their professional findings that based upon the wetland delineation provided by the Plaintiff, and upon the team's observations during their site visit, the team could not determine that there had been a discharge of dredged or fill material into waters of the United States, due to the level of site disturbance, and that therefore, the team had concluded that there was no violation. [Exhibit 31]

59.     Thus, due to Anderson's erroneous report and additionally due to the US Army Corps staff stonewalling the issuance of a decision which would have conflicted with Anderson's report, there was in fact no wetland violation. The Army Corps had found Anderson's report and findings to be erroneous. The Army Corps had found that contrary to Anderson's report, the Plaintiff's client had committed no wetlands violation. As a direct result of Anderson's wrongful conduct, as of the date of the filing of this initial complaint, the gravel pit has not sold.  Anderson has committed retaliatory actions against the Plaintiff on multiple occasions involving multiple clients and properties.  The Plaintiff alleges that Defendant John Cooper, a Planner for Skagit

County, collaborated and conspired with Anderson on the Burlington, Washington matter referenced herein.

**KATHLEEN KUNZ**
**MICHELLE WALKER**
**SARAH COOK**
**SIRI NELSON**
**MATT CADICAMO**

60.     The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts:  On or about 1998, Defendant Kathleen Kunz, an employee of the Army Corps of Engineers, was observed falsifying data by the Plaintiff and by his professional associate, Richard Herriman, a retired federal USDA employee, during a site visit in Camas, Washington. As a direct result of the falsified data which supported Defendant Kunz's claim that the property was a wetlands, the Plaintiff's client – owner of the property at issue – lost the use of his land, and an approximate value of $20,000,000. The property itself was deemed unusable. An Exhibit is attached, [Exhibit 32] identified as an internal US Army Corps memo addressing the site and the matter, discovered via a FOIA request. The memo constitutes a threat that if the Plaintiff were to continue to question the work of Corps regulatory agents, he would be investigated by the federal marshal service and additionally contains confirmation that the Plaintiff was threatened by the Environmental Protection Agency for asking questions – and that should the Plaintiff continue to question the Army Corps, the Corps would ensure that criminal investigators would be sent after the Plaintiff and his associate, Mr. Herriman, notwithstanding that Mr. Herriman, a retired federal employee with over 30 years distinguished service, had worked closely with the Army Corps on field investigations while serving as Assistant State Soil Scientist in California.  Mr. Herriman and the Plaintiff's company contracted with the US Army Corps to provide training. [Exhibit 33]

61.     During those investigations, the Army Corps would arrange for site visits by Mr. Herriman, and would rely upon his expertise.   The Plaintiff alleges that both the EPA and the Army Corps were concerned that the Plaintiff would expose the fraudulent collection of field data, or attempt to prevent such fraud. The internal Army Corps memo referenced herein was a concoction of falsified facts, and constituted personal attacks and insults against the Plaintiff's character and professionalism based solely upon Defendant Kunz's feelings and/or false claims, and thus baseless and retaliatory yet with damaging effect. The Army Corps produced no other documents in support of the allegations.

62.     Defendants Michelle Walker, Sarah Cook, Siri Nelson, and Matt Cadicamo colluded, collaborated and conspired with Defendant Kunz by initialing the false statements contained in another letter despite not being present at the site visit referenced in the letter, and thus having no personal knowledge that the Plaintiff was "aggressive". Defendants Kunz, Walker, Cook, Nelson, and Cadicamo thus knowingly disparaged the Plaintiff by falsely representing knowledge and had the US Army Colonel sign a fraudulent document.[Exhibit 34]

63.     In sum, on or about March 15, 2009, Defendants Kunz, Walker, Cook, Nelson, and Cadicamo each reviewed and approved a false document by initialing their acceptance, approval, and corroboration. [Exhibit 34]  Plaintiff's client, Cindy Jacobsen, received an alternate version of the document/letter.  This alternate document/letter reflects the tone of the Kunz internal memo. [Exhibit 32] The Defendants referred to Ms. Jacobsen's letter of February 16, 2009, wherein Ms. Jacobsen had written that "Shortly after digging the first hole, Mr. Bredberg and Mr. Perry got into a heated verbal confrontation." [Exhibit 35]

64.     Because this was a false statement insofar as no such heated verbal confrontation occurred, the Plaintiff thereafter asked Ms. Jacobsen the basis of the allegation. Ms. Jacobsen

admitted to the Plaintiff that she was told to write the allegation under duress by both her father and by Tom Sheehan. In fact, the Army Corps was aware of the potential sale of the property. In fact, the Army Corps had performed a site visit on July 16, 2008 with the Plaintiff. In fact, the visit had included only genial interactions between Mr. Perry and the Plaintiff.  [Exhibit 36]

65.     On or about February 7, 2009, Ms. Jacobsen wrote in an email that she noted how Paul Anderson, Army Corps, and Washington Department of Ecology personnel "were very short and disrespectful" to the Plaintiff and his associate, and that she discerned that the Plaintiff "is not liked by them and this will probably have some influence on their decision." [Exhibit 37] Thus, since at least 1998, U.S. Army Corps of Engineers civilian staff have demonstrated a pattern of RICO activity, as evidenced in Defendant Kunz's memo. [Exhibit 32]

66.     Additionally, civilian staff have stamped the Corps' Colonel's signature onto at least one false document, which was sent through the U.S. mail service from the Corps to the Plaintiff's client. This falsified document was discovered, and the conspirators identified, only via a FOIA request. [Exhibit 34]

67.     Enterprise members would treat the Plaintiff's clients differently, performing an "extra" level of review on those individuals, refraining to follow the proper manuals, and sending those individuals false information via email.  Whereas the Defendants have at times represented that their differences with the Plaintiff are solely matters of differing opinions on wetland delineations, wetland size, or regulatory status of wetlands, rather and to the contrary, since those issues can be easily discussed and agreed upon without unnecessary delay, the true differences between Enterprise members and the Plaintiff is that Defendants, including U.S. Army Corps of Engineers civilian regulatory personnel, follow a pattern of RICO activity consistent among all members of the Enterprise.  This pattern of activity of refusing to follow codified Federal

Manuals, collecting data in secret, refusal to discuss data in the field and threatening the Plaintiff

is memorialized in the 1998 Army Corps memo [Exhibit 32] and distributed amongst the

Enterprise.

**KATHRYN E. HEARD**
**DANIEL A. KRENZ**
**JERALD J. GREGORY**
**JOHN DOES 1-UNKNOWN #**

68.     For example, in the City of Marysville, Washington during the winter of 2016-2017, the

Plaintiff had performed due diligence by watching a site, and as the result prepared a simple

report indicating the existence of two small wetlands on a property – one approximately 2,500

sq. ft., and the other approximately 1,000 sq. ft.. [Exhibit 38] Because those wetlands were so

small, the City was authorized under law to opt not to regulate them. The Plaintiff submitted his

report to the City in September, 2017. [Exhibit 39] This report was reviewed by the Washington

DOE. The Washington DOE agreed with the Plaintiff's report. [Exhibit 40] [Exhibit 41]

69.     Marysville City Code provided for a simple process by which the two small wetlands

could be filled, and the project permitted to proceed. But when the U.S. Army Corps of

Engineers was notified of the intent to perform the minor filling. The Corps requested more

information, via email. [Exhibit 42]  Subsequently, a very detailed response was provided to the

Corps. [Exhibit 43]  The response had also frankly informed the Corps that some of the Corps'

requested information was irrelevant to the site and to the project, including some clearly

sophomoric and unnecessary questions seemingly and arguably prompted by the fact that the

Plaintiff was involved, with the aim to challenge and delay.

70.     The Plaintiff's client then met at the site in approximately late December, 2018 with four

Corps staff members. This site visit immediately followed a heavy winter rainfall. [Exhibit 44] In

the course of that 90 minute visit, Corps staff members made several false comments, which were memorialized in an email. [Exhibit 45]  Army Corps Staff further stated that the Plaintiff's report, already approved by Washington DOE, was erroneous in its' totality, and must be redone or such report would merit no consideration. Yet the Army Corps staff had collected no data to support their rejection of the report and their assertions as to same, consistent with Enterprise activities.

71.    The Enterprise in this action often acts subtly, in a manner and with actions which are noted and understood by wetland science professionals, but otherwise hardly noted, and little understood. An individual possessive of an understanding of the relevant federal manuals would understand.  The Plaintiff, therefore, has noted their actions, and understands them. The Enterprise depends upon their actions not being detected or exposed.

72.    As an example of Enterprise activity in this manner, the Army Corps in Oregon had sent a team to visit a site at 7:30 a.m. after a 50-year rainstorm, for the purpose of photographing ponding at a site. The Army Corps then presented the photo as evidence of a wetland. When projects had been approved by a City, a County, or by the Washington DOE, the Army Corps had often stepped in to override those approvals, and/or to create and ensure unnecessary delays. Members of the Enterprise employed by the Corps have repeatedly retaliated against the Plaintiff, often for merely having asked questions.  Members of the Enterprise employed by the Corps are well-trained experts, and most are members of the Society of Wetland Scientists, and certified as professional wetland scientists (PWS).

74.    The Corps does not regulate wetland categories or use wetland rating forms, yet the members of the Enterprise employed by the Corps discredit the Plaintiff's work by making negative comments about his findings and his professional conduct. Even when the Washington

DOE concluded that "the delineation and wetland rating were done correctly" by the Plaintiff, [Exhibit 40] and provided guidance to applying for proper permits as the project would move forward, the Corps would intervene with "extra review" and irrelevant points and questions in order to harass the Plaintiff and ensure delays, such as stating that "no plot size was indicated for vegetation sampling," necessitating the Plaintiff's laboring to prepare a comprehensive and extensive response – indeed, the expenditure of days, without charging his client for his time, energies, and expenses – to this irrelevant point. [Exhibit 43]

75.     The Plaintiff's assertion herein that the point noted was irrelevant is not a matter of opinion, as the Corps' own 2010 Supplemental Manual states as follows:

> ***"The sizes and shapes of plots, if used, may be modified as appropriate to adapt to site conditions and should be recorded on the field data form if they deviate from those recommended in the Corps Manual."***

## ALEX CALLENDER

76.     In a specific case where vegetation sampling plots did not deviate from the Manual, they were not noted on the data forms by the Plaintiff. Members of the Enterprise employed by the Corps know this as well as, or better than, the Plaintiff. Yet the Members forced the Plaintiff to respond, in the interest of harassment, added expense, and delay.  Despite that the Corps' own manual stated that there is no need to list a plot size, the Members knew that wrongfully pointing out errors in the Plaintiff's work would make the Plaintiff appear incompetent and prone to turning in incomplete work before the City, his clients, and other consultants such as engineers, surveyors, architects, and planners.  Defendant Alex Callender, under color of law as an employee of the Washington Department of Ecology, in service to the purposes of the Enterprise had further submitted false data which did not match with either Army Corps data or with the Plaintiff's collected and analyzed data. [Exhibit 46; Exhibit 47; Exhibit 48]

77.     For another example, the Corps in the same case had noted that "soils data was incomplete, with no percentage of matrix listed, no soil indicator marked, and an inconsistent depth analysis, with no relevant notes. Ponding for two weeks is not a soil indicator. Please add missing data, review, and complete." The Plaintiff was forced to respond in detail to this contention, and his response referenced and incorporated the federal manuals listed as mandatory for use in the Corps' own manuals.

78.     The federal manual states as follows:

> **RE: "percentage of matrix listed"** Only one color is present in all horizons, as such that color is the matrix and automatically understood to be 100%. If other colors are present that influence a hydric soil determination, they would be listed as redox features and the % matrix and redox type and location provided on the data sheet. The exceptions on this site are TH4 and TH5, where the B horizon is missing (thus we know the site has been excavated) that are a mix of colors.

79.     The colors are reported per the Soil Survey Manual: *United States Department of Agriculture Handbook No. 18, Issued March 2017.* This manual is a revision and enlargement of U.S. Department of Agriculture Handbook No. 18, the *Soil Survey Manual,* previously issued October 1962 and October 1993. This version supersedes both previous versions.

80.     Proper reporting of more than one soil color (at page 150) is noted as follows:

> **Dominant Color: The dominant color is the one that occupies the greatest layer volume. It is always listed first among the colors of a multicolored layer. It is determined using the colors on ped faces or broken peds or on a matrix sample in structureless horizons. If two colors occur, the dominant color makes up more than 50 percent of the volume. If three or more colors are noted, the dominant color makes up more of the layer volume than any other color, although it may occupy less than 50 percent. The expression "brown with yellowish brown and grayish brown" signifies that brown is the dominant color and may, or may not, make up more than 50 percent of the layer. In some layers, no single color is dominant and the first color listed is not more prevalent than others. The expression "brown and yellowish brown with grayish brown" indicates that brown and yellowish brown make up about equal amounts and are codominant. If the colors are described as "brown, yellowish brown, and grayish brown," the three colors make up nearly equal parts of the layer."**

81.     Because two colors are present and are not redoximorphic features they are both listed in

the Matrix column. The predominant color is listed first per the Soil Survey Manual. The Corps'

contention regarding no soil indicator marked was addressed by the Plaintiff in detail in his

original report, and then clarified in his extensive additional report.

> **RE: No soil indicator is marked**  The problem soil indicator is marked on the revised
> data sheets. The soil lacked indicators so none were marked. Remarks address that
> issue. Lacking indicators does not preclude the area from being designated wetland
> and is covered in the 2010 Manual under problematic Hydric Soils page 111.

82.     The Manual stated that:

> **"6. Seasonally Ponded Soils. Seasonally ponded, depressional wetlands occur in basins
> and valleys throughout the Western Mountains, Valleys, and Coast Region. Most are
> perched systems. The soil with water ponding above a restrictive soil layer, such as a hardpan
> or clay layer that is at or near the surface (e.g., Vertisols). Some of these wetlands lack
> hydric soil indicators due to limited saturation depth, saline conditions, or other
> factors."**

83.     The Plaintiff in his report had stated that:

> **"7-19-2017 the site was visited for the third time and the weather was hot and dry
> with a light wind from the west. Attached site plan and three enlarged wetland
> flagging maps show the delineation. The site was visited twice during the winter
> months to confirm ponding and again in April to confirm ponding during the
> growing season."**

84.     Further, the Plaintiff's report had stated that:

> **"The wetland is mostly bare soil at the time of the visits. It is a wetland ponded in
> the winter and dry in the summer. Too wet for non-wetland plants in the spring and
> too dry in the summer to support wetland plants. Some scrub/shrub is on the
> margin and in the wetland."**

85.     Although the soils at the site lacked a hydric indicator, the Plaintiff had made multiple

visits to the site in order to confirm the presence of wetland hydrology. The Plaintiff recognized

that the issue of hydric soils is complex, and he made proper reference to the 1987 Federal and

2010 Supplemental Manuals.

86.    The Corps had categorized two areas as wetlands, despite the lack of hydric soils.  The Corps had even questioned the Plaintiff's declaration of an area to be wetland.  As such, even when the Plaintiff found that an area was a wetland, the Army Corps staff questioned whether the Plaintiff could possibly be correct. Finally, the Corps concluded that the wetland was not large enough. [Exhibit 45]  This necessitated yet another response from the Plaintiff, utilizing the Corps' own manuals and other mandatory manuals in order to explain the obvious to highly trained Corps personnel.

87.    The Corps had contended that "As for the field observations, we observed many species (including blackberry, carex, juncus, and reed canary grass) both within the wetland boundary and outside the boundary that were not included on the data forms." Yet the Plaintiff's report had stated that "The wetland is mostly bare soil at the time of the visits. It is a wetland ponded in the winter and dry in the summer. Too wet for non-wetland plants in the spring and too dry in the summer to support wetland plants. Some scrub/shrub is on the margin and in the wetland."

88.    The Corps had contended that "We saw little difference in the vegetation, soils and hydrology across the site. There was no clear reason for the delineated boundary based on the data presented in the forms and that observed in the field." Yet the majority of the site was clearly upland soils, and the Corps itself seems to have acknowledged that the entire site was upland in their email. [Exhibit 45]

89.    Since the Corps had stated that there is no difference in vegetation, soils and hydrology across the site, the Corps had recognized that no wetlands were present. The manual requires ponding to be present during the growing season for a positive wetland determination. According to the manual, the growing season on the site at issue begins on approximately March 1. Yet the Corps made a determination on hydrology in late December, the non-growing season.

90.     Thus, the Corps was not following their own codified manuals.  Further, the COE

presented no data. This was also a requirement stated in the manual. Enterprise Members choose

not to follow the manual, choose not to collect data, and yet choose to arrive at conclusions that

the Plaintiff is in error.

91.     When the manual is followed, the Plaintiff is typically correct. Only the Plaintiff had

visited the site numerous times, including early in the growing season, to confirm the ponding

that marked the limit of the wetland area.  The Corps had further asked that the Plaintiff's client

"recheck the delineation against current field conditions." Yet the Plaintiff had checked the

delineation over a 6 month period, in the winter, in the early growing season, and finally in the

summer.  The Corps collected no data, provided no data, and ignored the Plaintiff's report and

the requirements of their own manuals, and yet still disparaged the Plaintiff to his client, and

caused further delay and expense.

92.     Enterprise Members employed by the Corps used standard coercion practices and tactics,

requiring a new and/or revised delineation, under clear threat that if not complied with, the

project would remain on hold. Yet Members stated this requirement without having followed

their own manual, and thus made an arbitrary and capricious statement without supporting data.

93.     In this case, the Plaintiff's client had written to the Corps reiterating a request for "any

data forms you may have generated during your field visit so that we can compare specific notes

in the field." The Corps had responded that "We do not have the resources to perform the

delineation or take formal delineation data plots." [Exhibit 45] Yet four Corps staff officers and

members had spent 90 minutes on the site, in addition to driving time, while claiming a lack of

resources to collect data. [Exhibit 44]  A professional wetland scientist, including Corps staff

members, need roughly 10 (ten) minutes to collect data in order to make a wetland interpretation on site as per the Corps' own manual.

94.     The Corps had added that "What we could say for sure was that the dataset that was presented was incomplete." Thus the Corps chief had stated that the Corps had made a determination that the dataset presented was incomplete, while yet not having collected any of their own data. Without having collected data, clearly the Corps had neither processed any data. If the Corps had collected and processed data, it could have been contrasted with the Plaintiff's data. Due diligence would require that actual field notes to support the Corps' decision would be compiled, and made available to the property owner.

95.     The Corps chief had stated that "We have laid out some examples, but most of the data sheets did not match the conditions on the ground and we ask that the full delineation be looked at again." Thus, the Corps informed the Plaintiff's client that the Plaintiff's data was erroneous, despite that the Plaintiff had spent many hours on the site over a six month period, while following the Corps manuals, and providing detailed descriptions and field data. With one site visit during a period of heavy rain in the winter by four trained experts employed by the Corps, collecting no data, the Corps had concluded that the Plaintiff's data was erroneous.

96.     The Corps chief had written to the Plaintiff's client that "In the interim, I recommend that you temporarily withdraw the request (as it may take you some time review it and take additional data points in the field). This withdrawal just administratively pauses the review on our end and can be easily resumed once the requested information is provided." Thus, the Plaintiff was required to perform a new delineation, which would entail re-reporting what he had already reported. He would need to visit the site on several new occasions, report on conditions in the

1   early growing season, and perform all the other necessary tasks per the manuals – and yet as a

2   result likely produce the same findings as to a wetland delineation.

3   97.     The Enterprise Members knew this was a delay and added expenses and unwarranted

4   scrutiny which would result in treating the Plaintiff in this manner. Yet the Corps could

5   alternatively have simply sketched onto the site plans they had at the visit a drawing indicating

6   the wetland boundaries they were claiming. The Corps could have taken some data at a flag in

7   the field, and then explained why the Corps concluded that the Plaintiff was in error. Instead, the

8   Corps demanded a full delineation of a 1,000 sq. ft. puddle aka wetland created when a driveway

9   was built through uplands, and another small wetland created when an area was bulldozed,

10   resulting in a depression in historic uplands.

11   98.     The Corps chief also informed the Plaintiff's client that "We have laid out some

12   examples," Yet the Corps had laid out no examples, and provided no data to support their

13   opinions and findings. The Corps refused to provide any science or hard evidence to support, as

14   required in their own manuals.

## THE WATERSHED COMPANY
## ALEX CAPRON
## HUGH MORTENSON

17   99.     The Plaintiff on information and belief alleges that Defendant Hugh Mortenson, president

18   of the Watershed Company, and his employee Capron, knew or should have known that

19   statements made about the Plaintiff were both erroneous and defamatory and knew or should

20   have known that third parties, including municipal administrators with authority to make

21   decisions which affect the Plaintiff and the Plaintiff's clients, would and in fact did act on the

22   basis of information provided to those authorities and officers by The Watershed Company.

23   [Exhibit 49]  The Defendants' conduct, with allegations as to each individual Defendant herein

24

25

COMPLAINT: BREDBERG v. CALLENDER, et. al.
Page 35 of 72

1    specified, includes but is not limited to the following facts:  On or about 2018, one or more of the

2    Plaintiff's clients attended a meeting with the City Administrator for the City of Sultan,

3    Washington concerning a client's development project, subsequent to receipt by the City of a

4    report on the property at issue authored by the Plaintiff. [Exhibit 50]  The Administrator

5    informed the client that his project must be re-reviewed for potential wetlands on basis that the

6    Plaintiff's work would not be accepted by the Washington DOE, that the Plaintiff's work was

7    invalid on that basis, and that the Plaintiff was "blackballed" by the Washington DOE.

8    Additionally, a previously prepared map and report by Wetland Resources had been included

9    with the Plaintiff's report, [Exhibit 51] which map had indicated more wetlands than the Plaintiff

10   had reported.

11   100.    The Plaintiff's client had a conversation with Alex Capron, planner for the City of Sultan

12   and an employee of The Watershed Company contracted to the City of Sultan. Capron provided

13   the Plaintiff's client with the same statements regarding the Plaintiff's work and reputation that

14   the Administrator had provided to the client(s). The Plaintiff subsequently received a phone call

15   from the Administrator. [Exhibit 52] The Administrator stated that the City was "working with

16   bad information" which the City had received from Capron. After the phone call referenced

17   herein, the Plaintiff received a phone call from Hugh Mortenson at The Watershed Company.

18   Mortenson apologized to the Plaintiff for "the misunderstanding."

19   101.    When the Plaintiff asked Mortenson for the source of the misinformation which Capron

20   had provided to the City of Sultan and to the Plaintiff's client(s), Mortenson informed the

21   Plaintiff that Mortenson had been the source. On information and belief, there was no

22   misunderstanding, but rather malicious intent on the part of Mortenson, Capron and The

23   Watershed Company.  The Plaintiff and his clients suffered losses and harm due to the false

24

25

COMPLAINT: BREDBERG v. CALLENDER, et. al.
Page 36 of 72

information provided by The Watershed Company and staff, and because of the disparagement and falsehoods.

**PAUL ANDERSON**

102.     The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts:  On or about 2004, one of the Plaintiff's clients had entered into a Protected Critical Area Easement Agreement with Skagit County, Washington. The Agreement prohibited or limited activity on the client's property, except as permitted by the County. When the client desired to allow his livestock to graze on his property, he contacted the responsible officer for the County, and was informed that the client must hire a wetlands scientist to perform a new analysis, and that if the scientist should determine that the property is not a wetland, the County would permit grazing. [Exhibit 53]

103.     The client was specifically informed that if this determination were made, an additional or third party review would not be deemed necessary by the County, under the circumstances at issue. The client then contracted with the Plaintiff.  Before performing his review and analysis, the Plaintiff had asked his clients to confirm with the County that an additional or third party review was not necessary. The client re-contacted the County, and was told that only a "simple review" was needed, and that the County would not request an additional review, since a 1999 delineation of the property which had included a determination of jurisdictional wetlands on the property was "questionable" as to accuracy.

104.     The County further confirmed that if a wetland scientist's new review comported with the client's desire to pasture their cattle on the property, the County would issue an approval in that regard, and would not consult with the Washington DOE.  However, when the client informed

1   the County that the Plaintiff would be performing the review, the County abruptly changed its'

2   position.

3   105.    The County informed the client that since the Plaintiff would be performing the review,

4   the County would be calling in the Washington DOE. Further, the County informed the client

5   that Paul Anderson from the Washington DOE would be reviewing the Plaintiff's work.

6   106.    In approximately December, 2012, the Plaintiff informed the County in a letter that the

7   County's own Soil Survey had mapped the majority of the site as not a hydric soil, that the

8   property had ditches and a history of farming, and that the amount of wetlands on the site was

9   likely much less than was delineated in 1999, or not present at all.  The Plaintiff conducted his

10  research in spring, 2013, and reported a report with findings. The Plaintiff had dug thirty-three

11  test holes in the lowest and wettest areas of the property, and found no evidence of a water table,

12  as shown on page 34. [Exhibit 54]  The Plaintiff had provided data sheets, monitoring data, and

13  aerial photos for support. The Plaintiff had addressed the 1999 delineation in detail, noting

14  several important discrepancies. The Plaintiff had concluded that his client's property was not

15  wetlands.

16  107.    Two of the Plaintiff's colleagues had also visited the site and reviewed the report and

17  data, and concurred with the Plaintiff.  When the client informed the Plaintiff that Anderson

18  would be reviewing the Plaintiff's work, the Plaintiff related grave concerns, including that

19  Anderson had previously declared a 20-acre illegal wetland fill on a separate property in Skagit

20  County, Washington, whereas the Plaintiff, after performing the same analysis of the property at

21  issue, found no wetland fill. [Exhibit 27; Exhibit 28; Exhibit 29]

22  108.    The Plaintiff had also informed his clients that as to a wetlands review on a separate

23  property performed by the Plaintiff in Skagit County, Anderson had likewise reported that the

24

25

Plaintiff's findings were invalid and incorrect. In that instance, the Plaintiff had written at length with supporting documentation showing that Anderson had falsified data in order to retaliate against the Plaintiff. Anderson had in turn provided no corroborating data as to his decision. [Exhibit 55; Exhibit 56; Exhibit 57]

109.    The County, regardless, collaborated and conspired with Anderson and permitted him to review the Plaintiff's report regarding the client's pasture property. The County informed the client that Anderson would be coming to their property to perform an analysis, and that the client was advised that the Plaintiff was allowed on the site while Anderson was present but no interaction was allowed. The Plaintiff's colleague was also on site at the time and observed that Anderson had falsified field data, that Anderson erroneously represented that his data was accurate, that Anderson purposefully omitted reference to the subsequent field/site visit in his report, and omitted dates from the photos, that Anderson did not flag any of his data test holes in the field, that Anderson made a number of false statements in his report, Anderson dug all but one of his data plot holes in the disturbed soils of the pipeline easement or ditch bottoms and that Anderson had not followed the proper manuals and protocols.

110.    Nevertheless, in approximately August, 2013, Anderson informed the County that the client's property included wetlands. The Plaintiff and his client suffered losses and harm as the result of Anderson's actions. [Exhibit 53]

111.    The work of a reputable professional wetland scientist involves the determination of wetland boundaries, whether there are wetlands present, whether any wetland present is jurisdictional, determining any setbacks, determining the type and condition of soils, determining historic activity on the property, and opining based on data where and how many homes or business can be built on a site, if any. The Plaintiff relies upon codified government manuals to

determine where wetlands at issue are located. The Plaintiff in this matter has a reputation for having repeatedly overturned erroneous decisions as made by government and private sector actors, including the Defendants.

### RANDY MIDDAUGH
### HOWARD KNIGHT
### SEAN CURRAN

112.    The Plaintiff alleges that many private sector actors form alliances and work together with government actors, yet for the purpose and with the result to collaborate on erroneous decisions, which result in losses and harm to the Plaintiff and his clients. For example, in one project still unresolved as of the date of the initial filing of this Complaint, a developer with a project in Snohomish County has under contract a 4.26 acre parcel, and had notified the County as to plans for a housing development on the parcel.  In approximately April, 2016, the developer had received a wetland verification from Defendant Randy Middaugh, Principal Planner and Project Manager for Snohomish County. Middaugh stated that the parcel included wetlands. [Exhibit 58]  The developer appealed the County's decision as communicated by Defendant Middaugh. The developer informed the County that he intended at hearing to assert that the County's wetland verification was in error as to specific findings. [Exhibit 59] Howard Knight, a principal officer at the County, then informed the developer that the decision was not appealable. The County thus refused to accept the appeal.

113.    The project was held up for several years, and remains in limbo as of February, 2019, despite that in October, 2016, a County staff supervisor had issued a letter to the developer which, in fact, reversed the County's decision, and accepted the developer's contention that no regulated wetlands were on the property. [Exhibit 60]  Yet subsequently, Defendant Sean Curran

then issued a letter which rescinded the project wetland approval. [Exhibit 61]  Curran cited to a letter from the Department of Ecology which alleged that grading had been performed on the property without a permit. [Exhibit 62]  The developer and the County both knew that no such illegal grading had occurred. The developer informed Curran and provided proof.  [Exhibit 63]  Defendant Curran has a history of making disparaging statements about the Plaintiff. [Exhibit 64; Exhibit 65]  The Plaintiff alleges that Curran's statements were made with the explicit intent to deprive the Plaintiff of work and livelihood.  Defendant Curran is a Snohomish County employee, but as of September 23, 2017, had been offering his services as a wetlands expert on the internet. [Exhibit 66]

114.    The County stood firm on Curran's rescission, despite that the Washington DOE did not properly review the developer's submitted data – which included a wetlands report by the Plaintiff, [Exhibit 67] with whom the developer contracted – and did not collect or provide data related to or in support of the Department's allegation, excepting the statement that some hydrophytic vegetation had been observed on the site. Further, the developer had informed the County that illegal filling and grading had been performed by a neighbor to the east, and as such performed outside the developer's control, but which land disturbing activity had impeded the natural flow of water off the developer's site, and thus resulting in standing water which had the appearance of wetland conditions. [Exhibit 68]

115.    The developer then informed the County that a neighbor to the west had damned the historic outlet ditch without authorization in an attempt to create a wetland area, additionally creating an impoundment of storm water. [Exhibit 69; Exhibit 70]  But the County refused to overrule Curran's rescission, and refused to grant or accept an appeal. The developer had

provided evidence that at a site visit, Middaugh did not measure the thickness of the water table, as required, that Middaugh had informed the developer that although the site had been disturbed by record rain fall, which had caused atypical and abnormal conditions, and that the County would only consider present conditions – standing storm water -- however unusual for the site, for evaluation as to whether the property contains regulated wetlands. [Exhibit 71]

116.    Thus, the County employees, including Middaugh and Curran, made their detrimental determination based upon a disturbed site, and upon a shovel blade of soil, rather than on the methodology established in the 1987 and 2010 Federal Wetland Manuals. When the developer and the Plaintiff reminded the County employees that the site had been disturbed, and that there was clear evidence that the hydrology on the site had been affected by adjoining properties and construction activities, Middaugh stated that this was not their concern, and that those facts would not be taken into consideration by the County.  [Exhibit 63]

117.    On or about April 6, 2018, the County issued a review letter which requested a wetland study, and which stated that "[W]etlands must be delineated in accordance with the *Corps of Engineers Wetlands Delineation Manual,* (Wetlands Research Technical Report Y-87-1), and the *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Western Mountains, Valleys and Coast Region* (Version 2.0)." [Exhibit 72]

118.    The Plaintiff alleges and will produce evidence to support the allegation that the County and the Washington DOE have failed in this matter and have repeatedly failed to follow the referenced manuals, including negligently failing to document such adherence in support of reaching conclusions that the Plaintiff was in error. The Plaintiff alleges that he is treated differently.  His reports were prepared following the Federal Manual, flags were surveyed and

present in the field for County staff to review. The adjacent property had a wetland study completed by the Watershed Company which showed wetlands on the subject site. [Exhibit 73] This report was prepared and approved by the County [Exhibit 74] which stated, "however, staff could not locate the wetland boundary flags for Wetlands D, E, F". If no flags are in the field it is impossible to verify a boundary as accurate. Yet staff gave special consideration to Enterprise members of The Watershed Company and approved a wetland boundary with no idea where it was in the field. Enterprise members at County and Washington DOE also extended the wetland boundary as approved, with no flags, as accurate onto the subject site when there was no field data to support that boundary. The Plaintiff followed the manuals and that work was denied; an Enterprise member submits substandard work and it is approved. County staff prepared and approved a report lacking data and with improper data on forms. [Exhibit 74]  If the Plaintiff misses any small detail it is grounds for not accepting the report.

119.    When, in approximately October, 2016, the developer and the Plaintiff met on site with Snohomish County employees, soils, vegetation and hydrology indicators were evaluated, test holes were dug, and the participants at this site visit left the site in agreement that there were no wetlands on the property. As noted herein, the County had then issued a letter consistent with those findings. [Exhibit 60]  However, the Washington DOE then wrote a letter stating that the detailed report provided by the Plaintiff and the letter from the County staff employee concurring with the Plaintiff's findings were invalid. [Exhibit 62]  Curran then wrote a letter retracting the previous County approval. [Exhibit 61]  Middaugh, Curran and others knowingly falsified field data, refused to collect field data, misrepresented the facts in the field to the planner, developer

and realtor in order to retaliate against the Plaintiff, and further to retaliate against the Plaintiff's

clients for contracting with the Plaintiff.

### DOUG GRESHAM

120.    The Plaintiff alleges that Defendant Doug Gresham, an employee of the Washington

DOE, colluded and conspired with County staff to misrepresent site conditions, and to

misrepresent the required protocols in order to delay the project purportedly for the purpose of

obtaining new hydrology data, when in fact no new data or studies were needed. This allegation

is supported by federal manuals, Washington law, and County code. County staff and Defendant

Gresham were informed by Michael Romano, a planner working with the developer, as to site

conditions, protocols, and that no new data or studies were needed, [Exhibit 68]  while yet

County staff and Gresham ignored the facts and law. As of February, 2019, the project remains in

limbo due to the actions of County staff and Gresham.

121.    The Plaintiff's damages on the referenced project alone are at least $60,000, the

developer has lost at least $1,000,000 and the realtors a similar amount.

### KATHY VERBLE
### JANET MORLAN
### KEVIN MOYNAHAN
### LOUISE SOLLIDAY

122.    The Defendants' conduct, with allegations as to each individual Defendant herein

specified, includes but is not limited to the following facts:  On or about 2006, the Plaintiff was

hired by an Oregon landowner to perform a scientific analysis of the landowner's property in

Linn County, Oregon, to determine whether there were state-jurisdictional wetlands on the

property.  The Oregon Department of State Lands (DSL) sent two employees, Defendant Kathy

COMPLAINT: BREDBERG v. CALLENDER, et. al.
Page 44 of 72

Verble and Defendant Janet Morlan, a member of Soil Scientists Society of America and of the Society of Wetland Scientists respectively, to the property. The employees then issued a report which disputed the Plaintiff's findings that the landowner's property did not include jurisdictional wetlands.  The Plaintiff notified the Oregon DSL that he stood firm on his findings, and that he disagreed with the Oregon DSL employees' findings.

123.    The dispute then extended to the Soil Science Society of America, in which the Plaintiff was also a member. One Department employee complained about the Plaintiff and wrote defamatory statements about him to the Society, and the other employee offered a letter-declaration in support of this defamation, as a direct result of which, the Plaintiff lost business not only from the landowner, but from other prospective clients and the Society itself. The Department employees had thus defrauded the landowner. The Defendants, acting under color of law as employees of the Oregon DSL, had knowingly submitted fraudulent data in support of their declaration, including to the Mayor of the Oregon city in which the landowner's property was located, that the property at issue included jurisdictional wetlands, when in fact it was not by any scientifically viable or accurate measure a jurisdictional wetland. .

124.    In approximately April, 2010 the Plaintiff filed suit in Oregon Circuit Court against the employees and the Oregon DSL for intentional interference with contractual and prospective economic relations, negligence, and defamation.   The employees as defendants filed a motion for summary judgment, in which they asserted that they had composed their defamatory complaint and supporting documentation about the Plaintiff during the course and scope of their employment with the Department, that they enjoyed various privileges with reference to their

written statements about the Plaintiff, and that the Plaintiff could not show a fact-finder that the employee/defendants had acted with improper means or purpose. The employee/defendants characterized the dispute as merely "a professional disagreement between wetlands scientists."

125.    Irreparable damage to the Plaintiff's professional reputation had been done. The Plaintiff did not dispute that Verble was a Certified Professional Soil Scientist, but he erroneously contended that neither Verble nor Morlan were qualified to review and evaluate land use issues, because of the erroneous field data they presented from their field work, and that Department officials did not accept the notion that they had to follow the same standards as wetland consultants, e.g. as the Plaintiff and other qualified soil and wetland scientists.

126.    The Plaintiff, in his capacity as a consultant, advocates for the fair and just treatment of his client property owners by government agencies and officers, and for accurate science in determining wetlands. The Plaintiff has been outspoken in his opinion that some government agents are not honest in their work and do not use the codified Federal and State Manuals as required by law.

127.    The Oregon case against Verble and Morlan, in which the Plaintiff prevailed in opposition to a motion for summary judgment by a presentation of disputed facts, and a showing, as stated by the presiding Oregon Circuit Court judge, that there may have been fraud committed in the delineation of the landowner's property by Verble and Morlan, was subsequently dismissed by the court, despite its' own ruling on summary judgment. The Plaintiff appealed the dismissal to the Oregon Court of Appeals, and again prevailed. The case was sent back to the trial court. The Plaintiff filed an immediate request for a change of judge. Subsequently the

defendants refiled the motion for the reversal and remand, the court dismissed the case again, without comment. The court did not rule on the preceding motion for a change of judges. The Plaintiff again filed an appeal, and was ultimately denied a review by the Oregon Supreme Court on basis that there were no relevant constitutional issues.

128.    In the Oregon case involving Verble and Morlan, as with the other Defendants referenced herein who committed similar acts in Washington, Verble and Morlan imputed the Plaintiff's inability or unfitness to perform the duties of his employment. Their expressed opinions about the Plaintiff also implied the existence of undisclosed defamatory facts. There was no retraction by either Verble or Morlan. Their ability to speak freely in this instance did not outweigh the Plaintiff's interest in his reputation. Their statements were not made in the course of judicial or quasi-judicial proceedings, were not made as part of their duties as employees, were not made to protect their interests or to protect the interests of their employer, and were not made on a subject of mutual concern to both Verble and Morlan, and to the Plaintiff's professional community. The Plaintiff is not a public figure, but is rather a private individual.

129.    In approximately May, 2013, the Plaintiff deposed Kevin Moynahan, Verble and Morlan's supervisor, and Louise Solliday, Director of the Department of State Lands, in the Oregon case.  Each deponent had submitted declarations in support of Verble and Morlan's motion for summary judgment. [Exhibit 75]) . The Plaintiff had performed a thorough investigation of soils on the property at issue in the Oregon case. The Plaintiff's soil scientist colleagues had concurred in the scientific conclusion that the property was not a wetland. [Exhibit 76]

130.    In approximately August, 2006, the Plaintiff met with Verble and Morlan on site at the property. The Plaintiff, Mr. Herriman and Professor Yee attempted to explain the intricacies of complex soils on the subject property. [Exhibit 76] The Plaintiff stated that Verble had not sought a second opinion as to her own determination that the property was a wetland. The Plaintiff was concerned that Verble had in fact refused to discuss her determination, or their conflicting determinations, while in the field with three experienced soil scientists.

## ERIK STOCKDALE

131.    One month prior to the meeting on the property in August, 2009, Morlan of Oregon DSL was communicating via phone and email with Erik Stockdale of Washington DOE, a wetlands specialist and Unit Supervisor. In response to a phone message left for him by Morlan, Stockdale wrote that "The fun continues with bozo." [Exhibit 77]  Stockdale was referring to the Plaintiff. Clearly, prior to the meeting on the property, and thus prior to Verble and Morlan's delineation of the subject property as wetlands, Morlan was predisposed to view the Plaintiff unfavorably, engaging in banter with an Enterprise member in Washington which disparaged and ridiculed the Plaintiff.

132.    Verble and Morlan knew that the Plaintiff was a soil scientist, whose business depended on his professional reputation.  Verble and Morlan knew that their statements about the Plaintiff were false.  Verble and Morlan intended to damage the Plaintiff's business reputation and standing in his professional community. Verble and Morlan knew that their actions would result in such damages.

133.    Verble and Morlan knew that the Plaintiff had economic relationships with the Society, with fellow soil scientists, with his current and prospective customer base, and with local, state,

and federal officials.

134.    Wetlands are found throughout the country. Some may be continuously underwater, while others may not be flooded at all.   The economic value of each wetland depends on its location, size, and other factors, such as whether they produce timber or food, and on their aesthetic values.   The Plaintiff's career as a soil and wetland scientist has involved numerous efforts on behalf of large landowners, farmers, small businessmen, and individuals who own small parcels of land.   The Plaintiff has been critical of the U. S. Army Corps of Engineers (Corps) and the U. S. Environmental Protection Agency (EPA) for not following their own codified Federal Wetland Manuals.   The Plaintiff has also criticized the Washington DOE, and the Oregon DSL for the same issues.   The Plaintiff believes that his criticism has been warranted, and appropriately stated.

135.    Wetland issues revolve around members of the Enterprise falsifying field data and or not following the codified manuals, the procedure was memorialize in 1998 and has been circulated to Enterprise members. [Exhibit 32; Exhibit 77; Exhibit 78]   The presence of a wetland is determined by a combination of soils, plants, and hydrology.   There are other criteria, including what conditions must be present, for how long, and during what portion of the year. Regulated wetlands, under the federal Clean Water Act, §404, are identified using technical criteria in a wetland delineation manual issued by the Corps in 1987 and updated nationally with supplemental manuals in recent years. The manual was prepared jointly and is used by the Corps, EPA, Fish and Wildlife Services, USDA and the National Marine Fisheries Service.   It provides a cookbook consistent approach guidance and field-level consistency among the agencies that have roles in wetland regulatory protection.

136.    The Plaintiff supports Section 404 of the Clean Water Act as intended to protect wetland areas from adverse environmental effects due to discharges of dredged or fill material.   It requires landowners or developers to obtain permits from the Corps to carry out activities involving disposal of dredged or fill materials into waters of the United States, including wetlands.  The Corps and EPA share responsibility for administering the §404 program.

137.    Prior converted croplands (PC) are wetlands that were drained, dredged, filled, leveled, or otherwise manipulated, including the removal of woody vegetation, before December 23, 1985, to make production of an agricultural commodity possible, which do not meet specific hydrologic criteria and which have had an agricultural commodity planted or produced at least once prior to December 23, 1985.

### JAMES GOUDZWAARD
### KATHLEEN KUNZ
### JANET MORLAN

138.    The US Army Corps and EPA are aware that the Federal Register identify a variety of waters and features that are not ''waters of the United States.'' "Prior converted cropland and waste treatment systems have been excluded from this definition since 1992 and 1979, respectively, and they remain substantively and operationally unchanged." Yet the Army Corps and EPA have been regulating Prior Converted croplands on many of the Plaintiff's projects. At a meeting in Oregon, Defendant James Goudzwaard and other Army Corps employees both threatened and intimidated the Plaintiff, his client, and his associates. Unconscionably, the Plaintiff was threatened with imprisonment in Oregon by Army Corps staff, including Defendant Goudzwaard, for stating his understanding that the Corps had no jurisdiction over the Plaintiff's client's property, on basis that the property was prior converted

croplands. [Exhibit 79; Exhibit 80; Exhibit 81] Defendant Goudzwaard and other Army Corps personnel provided false information to United States Senator Wyden (D. Or) and to his staff on the issue. In Camas, Washington in approximately 1998, the Plaintiff was threatened with EPA criminal investigation for making similar statements. [Exhibit 32] Defendants Kunz, Morlan and Goudzwaard shared information as to same three years later. [Exhibit 82]

139.    A certified professional soil scientist must agree to be bound by a code of ethics entitled "Duty To The Profession." If a scientist has positive knowledge of deviation from the code by another member, he has a duty to bring this deviation to the attention of the governing body, formerly known as the American Society of Certified Professionals in Agronomy, Crops, and Soils ["ARCPACS"].   Because Defendant Verble had inaccurately determined hydric soil conditions on the subject property in Oregon, the Plaintiff filed a complaint against Verble with a professional Society, alleging code of ethics violations. In response and retaliation, Verble made and published a counter-complaint against the Plaintiff with the SSSA. Verble's counter-complaint was supported by an affidavit provided by Morlan. Verble and Morlan testified that their purpose was effectively retaliation, because in their view, the Plaintiff had directly attacked the credibility of their employer.

140.    Verble and Morlan also asserted in testimony that before submitting her affidavit to the professional Society, Morlan had conferred with Kevin Moynahan and Louise Solliday, her supervisors at the Oregon Department of State Lands. Moynahan and Solliday testified that they "authorized" Verble to submit her counter-complaint, and that they "authorized" Morlan to submit her supporting affidavit. [Exhibit 75] Verble and Morlan also testified that their documents were drafted on Department time, on Department computers, and on Department

letterhead, while Moynahan – a licensed Oregon attorney -- had reviewed and approved their documents.  Moynahan wrote his own letter to the professional Society, offering unqualified support for Verble, claiming that the Plaintiff's allegations against Verble were unsupported by the record, and that the Plaintiff, rather than Verble, had distorted facts concerning the subject property. [Exhibit 83]   Moynahan also claimed in testimony that the US Army Corps of Engineers had agreed with Verble's findings regarding the subject property. At the time of his deposition, Moynahan had left the Department of State Lands to become Chief of the Technical Operations Branch of the Army Corps of Engineers.

141.     Verble, Morlan, Solliday and Moynahan were motivated by their desire to damage the reputation of the Plaintiff, and to impede the profitability of his business. Morlan's vitriolic supporting letter attacking the Plaintiff was nine pages long, single-spaced.  Morlan copied her letter onto a State of Oregon letterhead. Moynahan, who supervised Morlan, stated in testimony that he personally perceived the Plaintiff's complaint against Verble "as an event that would diminish support for [the Oregon Department of State Lands] among legislators and constituents," and as a "direct attack against the professional credibility of [the Department]."

142.     Regardless of his supervisory responsibilities, Moynahan's perception did not transform Verble and Morlan's acts from vindictive acts performed independently by one government soil scientist and her supervisor against a private sector soil scientist -- albeit during work hours, on State computers, and on State letterheads – to vindictive acts performed in service to the State of Oregon.  Moynahan had testified that "[W]e all agreed that it was important to respond on behalf of DSL," and that he agreed with Defendant Louise Solliday and Defendant Morlan "to authorize Ms. Verble" to submit her complaint about the Plaintiff to the professional Society "in her

official capacity as a DSL employee." Moynahan added that he and Solliday agreed to authorize

Morlan to submit her supporting affidavit in the same capacity.

143.     If Verble and Morlan were acting as DSL employees when they defamed the Plaintiff,

their supervisors submitted affidavits to the judge that Verble and Morlan were authorized to act

as such, and that moreover, their supervisors shared their negative opinions of the Plaintiff.

Moynahan and Solliday declaring that they "authorized" Verble and Morlan, or suggested

grammatical changes before "permitting" submittal of the defamatory instruments could not

retroactively transform those instruments into documents created within the course and scope of

employment, nor their acts of defamation into acts in service to the State of Oregon, to the

people of Oregon, nor even to the pursuit of policy directives dictated by their superiors

putatively in service to the people of Oregon. Yet Defendant Moynahan in deposition testimony

stated that he did not direct Defendant Verble to file a complaint about the Plaintiff, but rather

had only encouraged Verble that if she desired to file such a complaint, she would be able to

avail herself of Department resources. The Plaintiff alleges that Defendant Moynahan had thus

contradicted his own sworn declaration. [Exhibit 84]

144.     While Verble, Morlan, Moynahan and Solliday may truly have believed that they were

justified in telling the Plaintiff's professional community, existing clients, and potential clients

that he was a fraud and a liar, their actions were specifically designed and calculated to both

deprive the Plaintiff of his professional livelihood, and to deprive the Plaintiff's clients of

economic justice.  If Verble and Morlan had not knowingly and intentionally used erroneous data

in making wetlands determinations, or if they had not both disparaged and defamed a qualified

soil scientist working for a private property owner in order to promote and cover their nefarious

work, and if they had allowed the Plaintiff to perform his professional work freely in the free market, either winning business or failing on the basis of reputation and performance, the Plaintiff would have prospered far more than he has since meeting Verble and Morlan, and incurring their powerful vitriol.

145.    The Plaintiff and his professional brethren believe that the members of the Enterprise in Oregon's DSL wetlands program is a fraud perpetrated on the people of Oregon, and that Verble, Morlan, Moynahan, and Solliday were knowing players in this fraud.   Each directly damaged the Plaintiff – and by effect his clients – and this damage was not part and parcel of the Plaintiff's ordinary business risk. For example, in 2006 Verble and Morlan had performed a site visit and collected field data, then sent a set of their field notes, which they represented as true and accurate, to the City of Lebanon, Oregon. [Exhibit 85]

146.    Those field notes, which showed wetlands on the property at issue owned by the Plaintiff's client, were distributed as true and accurate by the State of Oregon. Yet when in 2011, through discovery in his Oregon Circuit Court lawsuit against Verble and Morlan, the Plaintiff was able to obtain the actual and original field notes prepared by Verble and Morlan, those notes showed no wetlands on the property. [Exhibit 86] The Plaintiff alleges that Verble and Morlan had altered the original field notes to support a finding that the site contained a wetland. The Defendants and their counsel, the Oregon Department of Justice, had intentionally neglected to produce the original field notes despite being subject to discovery requests and a Motion to Compel. Yet Defendants' counsel had informed the Oregon Circuit Court that Defendants had produced all requested discovery, and all same in Defendants' control and custody.  The Plaintiff alleges that in so doing, the Defendants and their counsel had lied to the court. [Exhibit 87]

147.    The Defendants had thus knowingly distributed fraudulent field notes from 2006 to 2011 and refused to produce the documents in discovery even with a motion to compel. When the Defendants had been in the test pit collecting data in 2006, the Plaintiff was present. The Defendants, rather than discussing their collection of data with the Plaintiff, had whispered to one another, and kept their notes secret. They refused to discuss the data or the collection process with the Plaintiff, and refused to allow the Plaintiff or his associates to view their notes. Defendants informed the Plaintiff and his associates that their purpose at the site was to collect data, but that their job responsibilities and duties did not include discussing their findings with anyone, including the property owner or his designated representative.

**KATHLEEN KUNZ**
**PAUL ANDERSON**

148.    This protocol with reference to the Plaintiff had been established for the Enterprise by Defendant Kathleen Kunz in her 1998 memo [Exhibit 32] – collect data secretly, which can later be altered, destroyed or otherwise manipulated to support of finding of wetlands on a property, and to find that the Plaintiff was in error, while keeping the Plaintiff 50 feet away during data collection, so that the Plaintiff could not observe document falsification and fraudulent field data.

149.    Defendant Anderson had also used this protocol. His employer, the Washington DOE, had banned the Plaintiff from any site visit, [Exhibit 88] thus ensuring that he was "more than 50 feet away" when data was collected.  The U.S. Army Corps of Engineers had followed the same protocol, banning the Plaintiff from more than one important site visit with Corps staff, and promising a copy of their notes at the end of a site visit, but later refusing to provide a copy to the Plaintiff.

150.    The falsification of field data, the erasure and alteration of original field notes so that the subject property would be delineated as a wetland and thus be unbuildable, and subsequent

defamation committed by Verble and Morlan ultimately cost the Plaintiff over $250,000, and cost his client over $4,000,000.  The Plaintiff alleges that Defendants Moynihan and Solliday both issued false statements to the Oregon Circuit Court in the course of litigation over this matter. The Plaintiff's client is still attempting to sell his property as of February, 2019. The Plaintiff alleges that the Enterprise continues to change his client's delineations. Thus, the Plaintiff's client has been "blacklisted" and has been receiving disparate treatment by the Enterprise due to his association with the Plaintiff.

151.    The Defendants' conduct, with allegations as to each individual Defendant herein specified, includes but is not limited to the following facts: On or about 2014, the Plaintiff prepared a wetlands report for a client in Everett, Washington, within the County of Snohomish. The County issued a land disturbing activity to the client for placing fill on the property, based upon a determination of a wetland by the County. Plaintiff prepared a report [Exhibit 89]. The County brought in Paul Anderson of the Washington Department of Ecology to concur with the County and to refute the Plaintiff's report. The Plaintiff had determined that there were wetlands offsite. He had flagged a pond, which was a man-made pond.

152.    Thus the wetlands onsite were man-made, resulting from construction fill, and as such non-jurisdictional wetlands. The documentation relied upon by the County [Exhibit 90] and the State [Exhibit 91] was in direct contravention with the findings of the Plaintiff and other wetlands biologists. The wetlands delineation provided by the Plaintiff accurately showed wetland boundaries on the site following the manuals with proper data collection and data sheets in support of the decision. The Plaintiff had also provided a buffer enhancement plan to mitigate any impacts to a potential buffer disturbance.  The client had pushed dirt up to the edge of the

man-made pond.  But because the client had contracted with the Plaintiff, and the Plaintiff had

concluded that there were no wetland impacts on the property, but rather only buffer impacts –

impacts to the buffer zone between the property and any wetlands – the County and State staked

an adversarial position to both the Plaintiff and his client.

153.    Defendant Anderson had stated that "[T]he wetland report prepared by B&A, Inc. for the

property (dated November 7, 2013) significantly under-represents the extent of wetlands on the

property, and was not consistent with the site conditions observed by Ecology and County staff."

Defendant Anderson requested "[A] site plan showing delineated wetland boundaries, disturbed

wetland areas, and applicable wetland buffers following the buffer widths in the Mitigation

Guidance; and a mitigation plan for restoration of all disturbed wetlands and associated buffers

following the mitigation ratios in the Mitigation Guidance."

**SEAN CURRAN**
**JOSH BALDI**
**ERIK STOCKDALE**

154.    The Plaintiff had written to Anderson requesting his field data, which presumably would

have corroborated the allegation that the Plaintiff's report had under-represented the extent of the

wetlands on the property. [Exhibit 92] Anderson had responded with six short lines on one page

of field notes. [Exhibit 93] The notes Anderson provided did not support his false allegations that

the Plaintiff's report was erroneous. Yet Defendant Sean Curran at Snohomish County had

reiterated Anderson's false allegations. [Exhibit 90] Without support for his position, Curran had

then represented that the Plaintiff did not justify the wetland boundaries the Plaintiff had

calculated and submitted. Thus the Plaintiff submitted a second report.  [Exhibit 94]

155.    In frustration, the Plaintiff's client, a property and business owner, had contacted a

Washington State Senator. The legislator inquired into the status of problems with the project. Defendant Josh Baldi at the Department of Ecology then performed an investigation. He interviewed Department of Ecology staff members Paul Anderson and Eric Stockdale. He did not, however, interview either the Plaintiff, or the Plaintiff's witnesses. [78]

156.     The site itself had a long history of disturbance, as a neighbor had built a berm in the wetland to block natural flow to the west, which berm backed water up onto the client's property. If historic drainage had been fixed by the County, the water would have drained off of the client's property. Even the Plaintiff's associate Dr. Steven Holzhey, a retired U.S. government employee and wetlands expert, had visited the site and collected field data – which precisely matched the Plaintiff's field data. [Exhibit 95].

157.     Regardless, as of February, 2019, the client has been unable to use his property, and has sustained tens of thousands of dollars in legal costs, fines, and other damages. The Plaintiff's reputation in Snohomish County has been further damaged, and he lost the client.

158.     In an email chain with members of the Enterprise, a landscape architect working for the Plaintiff's client aptly described the typical activities of the Enterprise. [Exhibit 96] As indicated in the document, Enterprise members had refused to meet with the Plaintiff on-site, refused to accept the scientific data presented by the Plaintiff, and yet had refused to offer any contradictory or conflicting scientific data with which to refute the Plaintiff's data. Enterprise members conducted themselves with an attitude reflecting their belief that they need not justify their wetland decisions with appropriate and mandated supportive data.

159.     Defendants knew or should have known that the Plaintiff's work as a professional Soil Scientist, Soil Classifier, and Wetland Scientist was being singled out and treated separately in

every instance cited above, from the work performed by other qualified scientists on behalf of their clients.

### THE WATERSHED COMPANY
### SOCIETY OF WETLAND SCIENTISTS
### CERTIFICATION PROGRAM

160.    RICO Defendants, at all times relevant hereto, were members of, affiliated with, and/or coordinating with Defendant business The Watershed Company and with Defendant organization the Society of Wetland Scientists Certification Program to directly or indirectly conduct or to participate in promulgating a pattern of racketeering activity as described herein, and which are the subject of this lawsuit.

161.    The RICO Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 et seq., with predicate acts of mail and wire fraud, and common law fraud. As a result, Defendants' misconduct has directly injured the Plaintiff, and entitles him to monetary damages to be proven at trial.

162.    At all relevant times, each and every RICO Defendant was acting in concert with, or as an agent for, one or more of the other RICO Defendants and, further, as described in detail below, conspired with one or more of the RICO Defendants to perform or authorize the acts averred herein.

163.    Plaintiff's state law claim arises out of the same case or controversy as his federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Washington State's Criminal Profiteering Act of 1985 is the state's version of the federal RICO law. RCW 9A.82.010, RCW 9A.82.080, and RCW 9A.82.120 provide civil penalties and remedies for a variety of criminal activities. "Criminal profiteering" is defined to include the commission, or

attempted commission, for financial gain, of any one of a number of crimes listed in the statute. The act provides that a "pattern of criminal profiteering activity" means engaging in at least three acts of criminal profiteering within a five-year period. The three acts must have the same or similar intent, results, accomplices, principals, victims, or methods of commission, or be otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise, and must not be isolated events. Thus, this Court also has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. § 1367. A substantial number of the events giving rise to this action occurred in this District. Venue is also proper under 18 U.S.C. § 1965.

164.    Plaintiff brings suit against the Defendants, as individuals and in their official and unofficial capacities, for violating Plaintiff's rights, for engaging in racketeering and other prohibited activities, and for directly and proximately causing mental anguish, severe emotional distress, emotional pain and suffering, and the loss of society and earnings the Plaintiff has experienced, and will experience in the future.

165.    This is a complaint for damages and equitable relief arising out of funding within the United States of America – through fraud, mail fraud, wire fraud, conversion and corruption – and a civil action for violations of 18 U.S.C. § 1961 et seq. (Racketeer Influenced And Corrupt Organizations Act or RICO), and for declaratory and injunctive relief; for actual, consequential and exemplary damages; and for all other relief which this honorable Court deems just and proper under all circumstances which have occasioned this Complaint.  RICO addresses the corrupt abuse and misuse – usually covertly – of organizations, entities, businesses, institutions or government agencies, such that superficially legitimate entities actually operate for criminal purposes irrelevant to the entity's purpose. See 18 U.S.C. §§ 1964(a) and (c) ("Civil RICO"). 18

U.S.C. § 1964(c) defines "racketeering activity" as follows:

(1) —racketeering activity‖ means

(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year;

(B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891–894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1351 (relating to fraud in foreign labor contracting), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461–1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581–1592 (relating to peonage, slavery, and trafficking in persons)., [1] section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections 2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos

of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341–2346 (relating to trafficking in contraband cigarettes), sections 2421–24 (relating to white slave traffic), sections 175–178 (relating to biological weapons), sections 229–229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501 (c) (relating to embezzlement from union funds),

(D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), punishable under any law of the United States,

(E) any act which is indictable under the Currency and Foreign Transactions Reporting Act,

(F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or

(G) any act that is indictable under any provision listed in section 2332b (g)(5)(B);

166.    The primary cause of this action is a widespread criminal *enterprise* engaged in a *pattern of racketeering activity* across State lines, and a conspiracy to engage in *racketeering activity* involving numerous RICO predicate acts during the past ten (10) calendar years. The primary objective of the racketeering *enterprise* has been to inflict severe and sustained economic hardship upon Plaintiff, with the intent of impairing, obstructing, preventing and discouraging Plaintiff from serving his clients, performing his normal work activities to the benefit of his clients, and from successfully confronting, challenging, and exposing the Defendants' fraudulent and criminal activities.

## **COUNT ONE:**

Acquisition and Maintenance of an Interest in and Control of an Enterprise Engaged in a Pattern
of Racketeering Activity
18 U.S.C. §§ 1961(5)

167.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby
incorporates same by reference, as if all were set forth fully herein.  Substance prevails over
form.

168.    At various times and places partially enumerated in Plaintiff's *documentary material*, all
Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a
RICO *enterprise* of individuals who were associated in fact and who did engage in, and whose
activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C. §§ 1961(4),
(5), (9), and 1962(b).

169.    During the ten (10) calendar years preceding February 1, 2019, *A.D.*, all Defendants did
cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts
that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of
the RICO law at 18 U.S.C. 1962(b) (Prohibited activities).

170.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses
itemized above in a manner which they calculated and premeditated intentionally to threaten
continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of
the RICO law at 18 U.S.C. 1962(b) *supra*.

171.    Pursuant to the original Statutes at Large, the RICO laws itemized above are to
be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title
18 of the United States Code, however.  See 84 Stat. 947, Sec. 904, Oct. 15, 1970.  *Respondeat*

*superior* (principal is liable for agents' misconduct: knowledge of, participation in, and benefit from a RICO enterprise).

**COUNT TWO:**

Conduct and Participation in a RICO Enterprise through a Pattern of Racketeering Activity
18 U.S.C. §§ 1961(5), 1962(c)

172.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein. Substance prevails over form.

173.    At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did associate with a RICO *enterprise* of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

174.    Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

175.    During the ten (10) calendar years preceding February 1, 2019 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. §§ 1961(1)(A) and (B), and did so in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

176.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of the RICO law at 18 U.S.C. 1962(c) *supra*.

177.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  *Respondeat superior* (as explained above).

### COUNT THREE:

Conspiracy to Engage in a Pattern of Racketeering Activity
18 U.S.C. §§ <u>1961</u>(5), 1962(d)

178.    Plaintiff now re-alleges each and every allegation as set forth above, and hereby incorporates same by reference, as if all were set forth fully herein. Substance prevails over form.

179.    At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ <u>1962</u>(b) and (d).

180.    At various times and places partially enumerated in Plaintiff's *documentary material*, all Defendants did also conspire to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ <u>1962</u>(c) and (d). See also 18 U.S.C. §§ <u>1961</u>(4), (5) and (9).

181.    During the ten (10) calendar years preceding February 1, 2019 *A.D.*, all Defendants did cooperate jointly and severally in the commission of two (2) or more of the predicate acts that are itemized at 18 U.S.C. §§ <u>1961</u>(1)(A) and (B), in violation of <u>18 U.S.C. 1962</u>(d).

182.    Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten

continuity, *i.e.* a continuing threat of their respective *racketeering activities*, also in violation of 18 U.S.C. 1962(d) (Prohibited activities *supra*).

183.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  *Respondeat superior* (as explained above).

### RELIEF REQUESTED

*Wherefore*, pursuant to the statutes at 18 U.S.C. 1964(a) and (c), Plaintiff requests judgment against all named Defendants as follows:

### ON COUNT ONE:

1.    That this Court liberally construe the RICO laws and thereby find that all Defendants, both jointly and severally, have acquired and maintained, both directly and indirectly, an interest in and/or control of a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom engaged in, and whose activities did affect, interstate and foreign commerce in violation of 18 U.S.C. 1962(b) (Prohibited activities).

2.    That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in    active    concert    or    in    participation    with    them,    be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from acquiring or maintaining, whether directly or indirectly, any interest in or control of any RICO *enterprise* of *persons*, or of other individuals associated in fact, who are engaged in, or whose activities do affect, interstate or foreign commerce.

3.    That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in    active    concert    or    in    participation    with    them,    be

enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT ONE *supra*.

4.     That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of *racketeering activity* in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s).

5.     That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

6.     That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(b), according to the best available proof.

7.     That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(b), according to the best available proof.

8.     That all Defendants pay to Plaintiff His costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable counsel's fees, at a minimum of $150.00 per hour worked (Plaintiff's standard professional rate at start of this action).

9.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(b) and from all other violation(s) of applicable State and federal law(s), be deemed

to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, His heirs and assigns.

10. That Plaintiff have such other and further relief as this Court deems just and proper, under the circumstances of this action.

**ON COUNT TWO:**

1. That this Court liberally construe the RICO laws and thereby find that all Defendants have associated with a RICO *enterprise* of *persons* and of other individuals who were associated in fact, all of whom did engage in, and whose activities did affect, interstate and foreign commerce in violation of the RICO law at <u>18 U.S.C. 1962</u>(c) (Prohibited activities).

2. That this Court liberally construe the RICO laws and thereby find that all Defendants have conducted and/or participated, directly or indirectly, in the affairs of said RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ <u>1961</u>(5) ("pattern" defined) and <u>1962</u>(c) *supra*.

3. That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from associating with any RICO *enterprise* of *persons*, or of other individuals associated in fact, who do engage in, or whose activities do affect, interstate and foreign commerce.

4. That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from

conducting or participating, either directly or indirectly, in the conduct of the affairs of any RICO *enterprise* through a *pattern of racketeering activity* in violation of the RICO laws at 18 U.S.C. §§ 1961(5) and 1962(c) *supra*.

5.   That all Defendants and all of their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT TWO *supra*.

6.   That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s).

7.   That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

8.   That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(c) *supra*, according to the best available proof.

9.   That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of 18 U.S.C. 1962(c)*supra*, according to the best available proof.

10.   That all Defendants pay to Plaintiff his costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement and all reasonable

counsel's fees, at a minimum of $150.00 per hour worked (Plaintiff's standard professional rate at start of this action).

11.     That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of 18 U.S.C. 1962(c) *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, His heirs and assigns.

12.     That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

## ON COUNT THREE:

1.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to acquire and maintain an interest in, and/or conspired to acquire and maintain control of, a RICO *enterprise* engaged in a *pattern of racketeering activity* in violation of 18 U.S.C. §§1961(5), 1962(b) and (d) *supra*.

2.     That this Court liberally construe the RICO laws and thereby find that all Defendants have conspired to conduct and participate in said RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra*.

3.     That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conspiring to acquire or maintain an interest in, or control of, any RICO *enterprise* that

engages in a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(b) and (d) *supra.*

4. That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from conspiring to conduct, participate in, or benefit in any manner from any RICO *enterprise* through a *pattern of racketeering activity* in violation of 18 U.S.C. §§ 1961(5), 1962(c) and (d) *supra.*

5. That all Defendants and all their directors, officers, employees, agents, servants and all other *persons* in active concert or in participation with them, be enjoined *temporarily* during pendency of this action, and *permanently* thereafter, from committing any more predicate acts in furtherance of the RICO *enterprise* alleged in COUNT THREE *supra.*

6. That all Defendants be required to account for all gains, profits, and advantages derived from their several acts of racketeering in violation of 18 U.S.C. 1962(d) *supra* and from all other violation(s) of applicable State and federal law(s).

7. That judgment be entered for Plaintiff and against all Defendants for Plaintiff's actual damages, and for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

8. That all Defendants pay to Plaintiff treble (triple) damages, under authority of 18 U.S.C. 1964(c), for any gains, profits, or advantages attributable to all violations of 18 U.S.C. 1962(d) *supra*, according to the best available proof.

9.     That all Defendants pay to Plaintiff all damages sustained by Plaintiff in consequence of Defendants' several violations of <u>18 U.S.C. 1962</u>(d) *supra*, according to the best available proof.

10.    That all Defendants pay to Plaintiff his costs of the lawsuit incurred herein including, but not limited to, all necessary research, all non-judicial enforcement, and all reasonable counsel's fees, at a minimum of $150.00 per hour worked (Plaintiff's standard professional rate at start of this action).

11.    That all damages caused by all Defendants, and all gains, profits, and advantages derived by all Defendants, from their several acts of racketeering in violation of <u>18 U.S.C. 1962</u>(d) *supra* and from all other violation(s) of applicable State and federal law(s), be deemed to be held in constructive trust, legally foreign with respect to the federal zone [*sic*], for the benefit of Plaintiff, His heirs and assigns.

12.    That Plaintiff have such other and further relief as this Court deems just and proper, under the full range of relevant circumstances which have occasioned the instant action.

### JURY DEMAND

Plaintiff, on behalf of himself and his estate, respectfully demands a jury trial on all issues so triable.

Dated: February 28 2019

Respectfully submitted,

AJ Bredberg
3303 43rd Street
Gig Harbor, WA 98335
253.858.7055

## Complaint Exhibit List

| | | |
|---|---|---|
| Exhibit 1 | 2014.04.14 B&A, Inc  Sammamish Report | A000001 |
| Exhibit 2 | 2016.03.02 Krabbe Declaration | A000039 |
| Exhibit 3 | 2018.04.28 Application and Receipt | A000041 |
| Exhibit 4 | 2014.05.22 Watershed Review | A000045 |
| Exhibit 5 | 2014.06.16 City Email | A000071 |
| Exhibit 6 | 2014.06.02 Email Chain | A000076 |
| Exhibit 7 | 2014.06.23 Machine Rental Receipt | A000083 |
| Exhibit 8 | 2014.07.10 B&A, Inc  Sammamish Report Final | A000085 |
| Exhibit 9 | 2017 .06.23 Nell Letter SR9 B&A Inc #4669 | A000122 |
| Exhibit 10 | 2017.02.28 Report B&A Inc #4818 Long | A000147 |
| Exhibit 11 | 2017.09.09 B&A Inc.#4818 Long | A000195 |
| Exhibit 12 | 2017.09.09 Invoice B&A Inc.#4818 Long | A000267 |
| Exhibit 13 | 2007.09.10 Old Approved Wetland Study and Maps | A000270 |
| Exhibit 14 | 2015 Approved Site Plan B&A Inc. #4642 | A000323 |
| Exhibit 15 | 2013.08.09 B&A Inc. #4642 Report | A000325 |
| Exhibit 16 | 2016.03.03 Al Jackson Declaration | A000398 |
| Exhibit 17 | 2014.03.11 DOE Email | A000401 |
| Exhibit 18 | 2014.04.28 B&A Inc. #4642 Report | A000404 |
| Exhibit 19 | 2003.03.03 Marc Bhend Declaration | A000564 |
| Exhibit 20 | 2016.03.03 Pastor Sebranke Declaration on Curran | A000566 |
| Exhibit 21 | 2018.08.29 Surveyor McDuffy Email | A000569 |
| Exhibit 22 | 2014.06.10 Sedona B&A Inc. #4669 Report | A000571 |
| Exhibit 23 | 2014.12.26 Lake Stevens/Watershed Comments Sedona | A000593 |
| Exhibit 24 | 2015.01.06 B&A Inc. #4669 Technical Memo | A000608 |
| Exhibit 25 | 2015.03.15 B&A Inc. # 4669 memo2 | A000640 |
| Exhibit 26 | 2008.04.14 Belfast Gravel Sale Contract | A000662 |
| Exhibit 27 | 2008.06.02 Washington DOE Paul Anderson Letter | A000671 |
| Exhibit 28 | 2008.07.14 Belfast Gravel B&A Inc. #4462 Letter 1 | A000678 |
| Exhibit 29 | 2008.07.16 US Army Corps Site Visit | A000681 |
| Exhibit 30 | 2008.11.25 Belfast Gravel and US Army Corps Timelines | A000699 |
| Exhibit 31 | 2009.02.18 US Army Corps Letter of Determination | A000708 |
| Exhibit 32 | 1998.04.28 US Army Corps Memo Camas WA | A000710 |
| Exhibit 33 | 1994.09.30 US Army Corps Training Contract with Plaintiff | A000715 |
| Exhibit 34 | 2009.03.15 Belfast Aggressive letter | A000718 |
| Exhibit 35 | 2009.02.16 Client Letter to US Army Corps | A000723 |
| Exhibit 36 | 2008.07 to 2009.01 Belfast Gravel Timeline | A000725 |
| Exhibit 37 | 2009.02.10 Dr. Holzhey Emails | A000741 |
| Exhibit 38 | 2017.02.19 Wick Letter B&A #4872 | A000748 |
| Exhibit 39 | 2017.09.16 Wick Report B&A #4872 | A000751 |
| Exhibit 40 | 2017.10.11 Horizon View Homes-Ecology Comments | A000796 |
| Exhibit 41 | 2017.11.08 7872 L2 | A000799 |
| Exhibit 42 | 2018.10.23 US Army Corps Email | A000802 |

page 1

Complaint Exhibit List Bredberg 2019.02.25

Exhibit 43  2018.10.31 Revisions B&A Inc. #4872                          A000806
Exhibit 44  2019.01.17 Planner Romano Notes 2                            A000850
Exhibit 45  2019.01.16 US Army Corps Emails                             A000852
Exhibit 46  2010.03.08 WA DOE Callendar Field Notes Holmquist           A000868
Exhibit 47  2010.06.03 US Army Corps Field Notes Holmquist              A000873
Exhibit 48  2009.11.12 Plaintiff Data Sheets                            A000884
Exhibit 49  2018.08.30 Sultan Ibershof Email Reply                      A000913
Exhibit 50  Surveyor Email RE Sultan                                    A000918
Exhibit 51  2017.10.08 B&A Inc Report #4930                             A000920
Exhibit 52  2018.08.30 Phone Call Logs/Notes Sultan #4930              A001033
Exhibit 53  2014.04.23 Nemnich Declaration for Writ                     A001035
Exhibit 54  2015.02.07 Nemnich Writ of Mandamus                         A001041
Exhibit 55  2009.06.16 Letter to Skagit County Planner Cooper           A001229
Exhibit 56  2009.05.27 Skagit County Docs Holmes Site                   A001241
Exhibit 57  2009.06.16 B&A Inc Letter Holmes Site                       A001306
Exhibit 58  2016.04.08 County Letter Evans Site                         A001352
Exhibit 59  2017.09.26 Evans letter                                     A001363
Exhibit 60  2016.10.21 County Scherf Letter Evans Site                  A001369
Exhibit 61  2017.09.15 County Curran letter Evans Site                  A001372
Exhibit 62  2017.09.12 Washington DOE Letter Evans Site                 A001375
Exhibit 63  2016.04.21 Romano Letter Evans Site                         A001379
Exhibit 64  2015.05.19 Varriano Email of Curran Phone Call              A001386
Exhibit 65  2016.03.02 Engineer Krabbe Declaration                      A001390
Exhibit 66  2017.09.23 Curran Environmental Web Posting                 A001392
Exhibit 67  2016.01.20 B&A #4807 Evans Report 1                         A001396
Exhibit 68  2017.09.26 Romano Letter on Fill Evans Site                 A001513
Exhibit 69  2017.11.22 Lindsay Declaration                              A001519
Exhibit 70  2012.04.05 Dam Documentation Page 2                         A001525
Exhibit 71  2017.09.29 Writ of Mandamus Requesting a Hearing Evans Site A001532
Exhibit 72  2018.04.06 County Review Letter Curran                      A001604
Exhibit 73  2008.12.24 Watershed Report                                 A001611
Exhibit 74  2005.09.01 County Review if Watershed Report                A001633
Exhibit 75  2011.10.11 Moynahan Affidavit                               A001636
Exhibit 76  2015.06.15 Herriman Declaration Brown Site                  A001640
Exhibit 77  2009.07.27 Stockdale/Morlan Bozo Emails                     A001646
Exhibit 78  2014.07.03 Washington DOE Letter to Senator Angel           A001655
Exhibit 79  2012.07.11 Mayor Toombs Affidavit                           A001658
Exhibit 80  2012.07.02 Brown Affidavit                                  A001661
Exhibit 81  2009.06.11 Goudzwaard Letter                                A001665
Exhibit 82  2001.11.02 US Army Corps Email to Oregon DOJ                A001668
Exhibit 83  2009.05.28 Moynahan Letter to Luther                        A001670
Exhibit 84  2013.05.08 Excerpt Moynahan Deposition                      A001673
Exhibit 85  2006.08.09 Altered Brown Site Field Notes From Oregon DOJ   A001677

Page 2

Complaint Exhibit List Bredberg 2019.02.25

Exhibit 86  2011.04.05 Original Color Scan of Altered Field Notes          A001706
Exhibit 87  2011.01.01 Oregon AG Letter on Complete Discovery              A001718
Exhibit 88  2014.03.25 Washington DOE letter to Plaintiff                  A001722
Exhibit 89  2013.11.07 B&A #4665 Report 1 Yoo Site                         A001725
Exhibit 90  2014.04.04 County Review Letter Yoo Site                       A001768
Exhibit 91  2014.02.18 Washington DOE Letter Yoo Site                      A001782
Exhibit 92 2014.03.12 Plaintiff Letter to Washington DOE Anderson          A001786
Exhibit 93  2014.04.14 Washington DOE Anderson letter to Plaintiff         A001789
Exhibit 94  2014.06.26 B&A #4665 Report 2 Yoo Site                         A001793
Exhibit 95  2015.03.18 Plaintiff Letter to Yoo Counsel Spencer             A001844
Exhibit 96  2014.12.08 Landscape Architect Email                           A001851

Page 3

Complaint Exhibit List Bredberg 2019.02.25